132 T.C. No. 14

UNITED STATES TAX COURT

MATTIE MARIE MASON, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4908-07.                    Filed May 6, 2009.


    P is majority owner and principal officer of C,
which failed to pay employment taxes.  R mailed a
notice of intent to assess sec. 6672, I.R.C., trust
fund penalties to P at P's last known address.  P did
not receive R's notice and the penalties were assessed.
R notified P of the intent to file a notice of Federal
tax lien with respect to the penalties.  P
administratively appealed and also filed a request to
abate the penalties.  After administrative review of
R's decision to file a lien, R determined to proceed
with the lien filing.  P's abatement request was also
denied.  P appealed both decisions to R's Appeals
Office.  During the hearing, an Appeals officer
simultaneously considered R's intent to file a lien and
denial of P's abatement request.  The Appeals officer
determined that P was not entitled to contest the
penalties as part of the hearing as it related to the
lien filing.  During the same hearing the Appeals
officer did consider the merits of the penalties as it
related to review of P's abatement request.

The questions presented are: (1) Whether pursuant to sec. 6330(c)(2)(B), I.R.C, a taxpayer has "otherwise [had] an opportunity to dispute" a sec. 6672, I.R.C., penalty and therefore is precluded from challenging the merits of that penalty at a collection due process hearing where the taxpayer never received a notice of intent to assess the penalty; (2) whether at any juncture during the administrative proceedings P "otherwise [had] an opportunity to dispute" the sec. 6672, I.R.C., penalties, thereby precluding P from challenging the merits of the penalties at P's collection due process hearing, and if not, whether P's underlying liabilities are before the Court for de novo review; (3) whether, for purposes of sec. 6672, I.R.C., the validity of R's notice of intent to assess trust fund recovery penalties depends upon a taxpayer's receipt of that notice; (4) whether P is liable for sec. 6672, I.R.C., penalties because P is a "responsible person" who willfully failed to pay over C's employment taxes; and (5) whether R's decision to uphold the lien filing was an abuse of discretion.

1. <u>Held</u>: A taxpayer must receive a sec. 6672, I.R.C., notice of intent to assess a trust fund recovery penalty to have "otherwise [had] an opportunity to dispute" that tax liability under sec. 6330(c)(2)(B), I.R.C. P did not receive R's notice of intent to assess sec. 6672, I.R.C., penalties and did not "otherwise have an opportunity to dispute" the underlying tax liability.

2. <u>Held</u>, <u>further</u>, P did not "otherwise have an opportunity to dispute" P's underlying tax liability at any time during the administrative proceedings. <u>Held</u>, <u>further</u>, P raised P's liability for the sec. 6672, I.R.C., penalties at P's collection due process hearing. P's liability for the trust fund recovery penalties is, therefore, before this Court for de novo review.

3. <u>Held</u>, <u>further</u>, a notice of intent to assess sec. 6672, I.R.C., penalties is valid for purposes of assessing the penalties even where a taxpayer does not receive the notice.

Consequently, even though P did not receive R's notice, R validly assessed trust fund penalties.

4. Held, further, P is a "responsible person" who willfully failed to pay over C's withholding taxes and P is liable for the trust fund penalties.

5. Held, further, R's decision to uphold the lien filing was not an abuse of discretion.

Mattie Marie Mason, pro se.

Susan K. Greene, for respondent.

OPINION

GERBER, Judge: This case arises from a petition for judicial review filed in response to a Notice of Determination Concerning Collection Actions(s) Under Section 6320 and/or 6330 (notice of determination) issued to petitioner Mattie Marie Mason.[1] The overall question is whether respondent may proceed with the collection action. The answer depends upon whether petitioner is liable for trust fund penalties assessed against her as a responsible person for failure to collect and pay over withholding taxes of New Life Perinatal Health Care Services Inc.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(New Life), for tax periods ended December 31, 2001, March 31, June 30, and September 30, 2002, and September 30, 2003.[2]

### Background[3]

Petitioner resided in Texas at the time her petition was filed.[4] She earned a bachelor of science degree in nursing in 1978 and thereupon commenced a 30-year career as a registered nurse. The focus of that career has been on providing services to pregnant and parenting women, especially teenagers. In 1989 petitioner incorporated New Life under the laws of the State of Texas. Corporate shares of New Life have at all relevant times been held 75 percent by petitioner and 25 percent by her husband Phillip Mason (Mr. Mason). Petitioner served as president and treasurer of New Life, while Mr. Mason served as vice president and secretary. New Life elected to be treated as an S corporation for Federal tax purposes.

New Life was licensed in the State of Texas as a home health agency. Through New Life, petitioner engaged in her primary

---

[2]The notice of determination reflects zero liability for the period ended Sept. 30, 2001. Petitioner paid the liability for this period, and she now seeks a refund. We do not have jurisdiction to review that period. See Greene-Thapedi v. Commissioner, 126 T.C. 1, 11 (2006).

[3]The parties' stipulation of facts and the attached exhibits are incorporated herein by this reference.

[4]At the time this case was petitioned, petitioner had elected the small tax case procedures. Before the commencement of the trial, with the agreement of the parties, the Court removed this case from small tax case status.

business activities of providing services to pregnant and parenting women, especially teenagers. New Life's mission included, among other things, home health care services, case management services for public and private third-party entities, health care education and consulting services and programs (e.g., programs aimed at prevention of pregnancy, school dropout, and illicit drug use among at-risk youth).

Case management programs accounted for the majority of New Life's business and revenues. In conducting that portion of the business, New Life would enter into contracts with entities such as school districts or hospitals to administer the provision of services to targeted high-risk groups. New Life, in turn, would hire independent contractors with backgrounds as registered nurses or social workers to serve as "case managers" providing care services to the particular patients or "clients" referred through the entities. Because the clients were principally high-risk pregnant and parenting women, especially teenagers, much of the revenue earned by New Life for their care was obtained through the Medicaid programs of the Texas Department of Health.

As New Life grew throughout the 1990s, petitioner assembled an administrative staff of approximately seven employees to manage the business and perform clerical support functions. Petitioner used a team management approach in conducting New Life's day-to-day operations. She delegated substantial

authority to staff members so that they could independently handle their administrative portion of New Life's operation.

Key members of that team during the late 1990s to early 2000s included petitioner, Walterene Reed (Ms. Reed), Shelly Morton (Ms. Morton), and Mabel Hatton (Ms. Hatton). Petitioner served as administrator overseeing management and was responsible for hiring and firing staff and establishing and maintaining business contracts. Ms. Reed was employed as New Life's office manager to oversee the activities of case managers, the referrals of patients/clients, and the billing process. Ms. Morton was a billing specialist responsible for handling Medicaid claims.

Ms. Hatton served as New Life's internal accountant. Petitioner delegated to her full authority for the financial, tax, and accounting matters of the business, including oversight of accounts payable and receivable, payment of bills and compensation, bank deposits, and preparation and filing of Federal employment tax returns. Although petitioner and Mr. Mason were the sole signatories on New Life's corporate bank account, it was petitioner's practice to sign blank checks for Ms. Hatton to complete and use in performing her duties. Petitioner likewise relied on Ms. Hatton's expertise in handling financial affairs, and she signed employment tax returns prepared by Ms. Hatton relying completely on Ms. Hatton's expertise.

By late 2000 and early 2001 the business of New Life reached its apex. With approximately 2,000 clients and 10 case managers, the corporation income approached $1 million. During spring 2001 New Life began to experience internal and external problems. In particular, New Life experienced difficulties with respect to the management staff, the independent contractors serving as case managers, and the receipt of payments from Government agencies and from other programs.

During March 2001 Ms. Reed became unable to continue working for New Life because of a serious illness that resulted in her death before the end of the year. A replacement for Ms. Reed was hired but proved to be incapable of handling the office manager's duties. In addition, other departures of administrative staff exacerbated New Life's problems. The loss of Ms. Reed left a significant gap in the operations of New Life and led to problems with, among other things, billing processes. Mounting unbilled or incorrectly billed claims in many instances foreclosed expected payments from Government programs, particularly Medicaid. Compounding these problems, some of the case managers began to use New Life's client base to start their own businesses, effectively taking New Life's clients and corresponding ability to generate revenue.

During this period petitioner was consumed with efforts to save the business; i.e., handling duties formerly covered by Ms.

Reed and personally serving clients on account of the reduced number of case managers. Ms. Hatton continued to be responsible for accounting and financial matters, paying creditors to the extent funds allowed and filing Federal employment tax returns without remitting payment. The failure to pay employment taxes began with the tax return for the quarter ending September 30, 2001, and continued into the first three quarters of 2002 and again for the quarter ended September 30, 2003. It was not until March 2002 that petitioner became aware that New Life's Federal employment taxes were not being paid.

On July 8, 2002, the collection of New Life's delinquent taxes was assigned to Revenue Officer Elvina Davis (RO Davis) of the Internal Revenue Service (IRS). RO Davis first contacted New Life by leaving a telephone message on July 16, 2002. On August 8, 2002, RO Davis reached Ms. Hatton and told her that she would need to obtain a power of attorney from petitioner in order for RO Davis to deal directly with Ms. Hatton. Near the end of August RO Davis received the power of attorney and began initial conversations with Ms. Hatton. It was not until November of 2002 that petitioner engaged in personal interaction with RO Davis. She also completed and provided RO Davis with a Form 4180, Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax, signed and

dated November 5, 2002. Form 4180 contained details of petitioner's relationship to and oversight of New Life.

Throughout the fall of 2002 and during 2003 investigation and collection activities continued in the form of conversations, meetings, requests for records, lien filing, etc. On February 12, 2003, RO Davis advised petitioner about options to settle New Life's debt and the potential for assessment of trust fund penalties against petitioner personally.

During September 2003, the State of Texas instituted massive changes to the case management program and concomitant Medicaid payment processes, which caused a substantial reduction of New Life's revenue stream. In response, petitioner laid off the New Life administrative staff and worked with volunteers to keep the business afloat and restructure for the new environment. In addition to those reductions, petitioner returned to work as a nurse in a local hospital to generate funds.

On January 23, 2004, petitioner submitted an offer-in-compromise for New Life's employment tax liabilities. That offer, however, could not be processed because New Life was not in compliance with return filing and payment obligations at that time. RO Davis contacted petitioner on that date to so inform her, and the two discussed how to proceed. RO Davis calculated an arrangement under which New Life could pay $1,150 per month through an installment agreement until an offer-in-compromise

could be processed, to which petitioner agreed. In addition, RO Davis advised petitioner that if she signed a waiver extending the period of limitations for assessment of trust fund penalties, made timely payments under the installment agreement, filed timely Federal tax returns, and made timely tax deposits, then the IRS would forbear from assessing trust fund penalties against petitioner.

Early in March 2004 an installment agreement was approved for the liabilities of New Life that provided for payments of $1,150 on the 28th of each month. The installment agreement was assigned to Revenue Officer Avis Smith (RO Smith), a case processor who monitors accounts and payments for respondent. Petitioner made installment payments under the agreement on April 27, 2004 ($1,150), May 28, 2004 ($1,150), September 10, 2004 ($1,150), November 19, 2004 ($1,100), December 28, 2004 ($1,150), January 28, 2005 ($1,150), March 4, 2005 ($550), March 10, 2005 ($600), and May 25, 2005 ($1,150), after which payments ceased. Payments made under the agreement were personally delivered by petitioner to respondent's office.

Throughout the entire period, petitioner, on repeated occasions, communicated with RO Smith and/or RO Davis regarding financial problems and difficulty in making payments. Petitioner also raised the possibility of decreasing the monthly payment to $500, but she did not formally pursue a reduction, opting instead

to proceed with preparation of a second offer-in-compromise.  On December 17, 2004, petitioner submitted the second offer-in-compromise.  However, like the first offer, the second was not processed because an employment tax return for New Life had not been filed.  Petitioner, however, continued her effort to perfect an offer.

Sometime during March 2005 the installment agreement was deemed in default on account of missed payments.  On April 14, 2005, petitioner contacted RO Smith in an attempt to perfect an offer-in-compromise.  During that conversation, although petitioner was advised of the installment agreement default, she did not fully comprehend what was being explained.  Accordingly, the default was again explained to petitioner when she spoke to respondent's personnel in June.  New Life did not receive formal, written notification of the default, apparently because of confusion regarding a change of the corporation's address.  After the April 14, 2005, conversation with RO Smith, New Life's case was transferred to RO Davis on account of the default, but petitioner did not learn of the case transfer until some time later.  Sometime during June 2005 petitioner's frustrations in her attempts to deal with various IRS personnel led her to contact the Taxpayer Advocate Service, thereby adding an additional layer of complexity to petitioner's involvement and communications with respondent.

On August 8, 2005, petitioner hand-delivered a third offer-in-compromise of New Life's tax debt, along with a $150 filing fee, to RO Davis. RO Davis forwarded the offer materials, first to her manager for approval and then, on August 15, 2005, to the IRS Service Center in Memphis, Tennessee, responsible for processing offers. Thereafter, the offer materials were returned to petitioner, absent the $150 cashier's check, with a form letter dated September 12, 2005, advising, without further explanation, that the "offer is closed". The return of the offer-in-compromise was caused by an error on the part of the IRS when it misapplied the $150 filing fee to payment of outstanding New Life liabilities. Petitioner at that juncture began to make inquiries regarding what had transpired with regard to the offer, and on September 21, 2005, she faxed a copy of the $150 cashier's check to the Memphis Service Center.

It was not until December 2005 that New Life finally received respondent's written notification concerning the earlier return of the August 8, 2005, offer-in-compromise. A brief form letter advised that a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, had not been included and that the $150 application fee had not been paid.

Meanwhile in early September 2005 a determination was made by the IRS to commence proceedings against petitioner personally

with respect to New Life's employment tax liabilities. RO Davis prepared a Letter 1153, Trust Funds Recovery Penalty Letter, proposing assessment of section 6672 trust fund penalties against petitioner as a person required to collect, account for, and pay over withheld taxes of the business for the unpaid liabilities. That letter further informed petitioner that if she did not agree, she could contact the individual identified therein (RO Davis) within 10 days of the date of the letter or could submit a written appeal within 60 days.

The Letter 1153 was mailed on September 2, 2005, hand-addressed to petitioner at what was then her address of record. Although a certified mail label and return receipt were affixed to the envelope, postage was placed thereon with a private postage meter and the letter was posted without being presented to a U.S. Postal Service (USPS) employee. As a result, no USPS postmark was date-stamped on the envelope, nor was the item number on the certified label entered into the USPS certified mail tracking system. Notations made on the envelope by the USPS indicate that delivery was attempted and notice was left for petitioner on September 3, 2005; that a second notice was left on September 8, 2005; and that the document was returned to the IRS marked "UNCLAIMED" on September 18, 2005. The unopened envelope, return receipt still attached, was received by the IRS on

September 29, 2005. Petitioner did not receive the Letter 1153 or notification of its attempted delivery.

On December 19, 2005, trust fund penalties were assessed against petitioner for the trust fund portion of New Life's outstanding employment tax liabilities, and notices of balance due were issued to her. Petitioner, surprised by the turn of events, began to investigate by contacting various individuals at the IRS. Her inquiries also led to internal inquiries by several of respondent's offices. It was discovered that the $150 filing fee petitioner submitted with the August 8, 2005, offer-in-compromise had been misapplied as a payment toward New Life's taxes for the period ended September 30, 2001.

A meeting was held on February 16, 2006, among, inter alia, petitioner, RO Davis, and RO Davis's supervisor. The participants discussed the mailing of the Letter 1153 and assessment of the trust fund penalties, petitioner's desire to appeal the assessments, and the procedures for such an appeal and for the continued pursuit of an offer-in-compromise. Shortly thereafter, RO Davis faxed to petitioner a copy of the envelope in which the Letter 1153 had been returned to the IRS. Petitioner took that information to the post office and spoke to USPS employees in an attempt to track the item as a certified letter. Such efforts, however, were unsuccessful on account of

the mailing procedures that had been used by respondent's personnel.

During the period March to May 2006, in addition to continuing work to perfect an offer-in-compromise, petitioner submitted various forms and letters in an attempt to forestall the filing of a Federal tax lien against her. To address the assessment of the trust fund penalties, petitioner needed to file a Form 843, Claim for Refund and Request for Abatement, disputing that she was a responsible person within the meaning of the employment tax statutes. Her early attempts to file could not be processed. For example, in March she sent a letter of appeal to RO Davis, rather than submitting a Form 843. Later, her initial Form 843, submitted in April and assigned to Revenue Officer Advisor Ken McNeil (ROA McNeil) in the IRS Technical Services Advisory, was returned to petitioner for failure to submit the requisite payment therewith of the amount of tax attributable to one individual for each tax period included in the claim; i.e., $2,927.

Meanwhile, on April 12, 2006, petitioner was given notice that the IRS was proposing and preparing to file liens against her for the assessed trust fund tax penalties. Petitioner was also advised that in order to dispute that proposal, she needed to file with the IRS a Form 9423, Collection Appeal Request. On April 13, 2006, petitioner submitted a Form 9423, thereby

initiating her participation in the IRS Collection Appeal Program (CAP) for prefiling challenge of the lien proposal.

The CAP appeal was assigned to Settlement Officer Liana White (SO White) of the IRS Office of Appeals. SO White held a face-to-face conference with petitioner on April 26, 2006. During that conference and followup telephone calls, petitioner alleged that she had never received the Letter 1153 proposing assessment of the trust fund penalties, and she argued that if the installment agreement for New Life had been renegotiated to an affordable amount, then assessment of the penalties would not have been necessary and no filing of a notice of lien would be needed. SO White explained the distinction between the corporate and individual proceedings and that the trust fund penalties can be assessed and liens filed regardless of whether the underlying corporation is under an installment agreement. SO White also communicated with ROA McNeil regarding the Form 843 abatement request and its rejection for lack of payment, and further explained those issues, and the steps to perfect the Form 843 claim, to petitioner.

SO White concluded the CAP process by means of a closing letter dated May 1, 2006. Because petitioner's Form 843 could not be processed at that time, SO White sustained the proposed lien filing but recommended that the filing be delayed until petitioner had been afforded an opportunity to perfect a Form 843

and then, if perfected, until a decision on the claim, including any attendant appeals, was made by the IRS. Because she was considering only petitioner's challenge to the proposed lien filing, SO White was willing to postpone her recommendations pending the outcome of ROA McNeil's investigation into petitioner's liability for the trust fund penalties. Petitioner was given until May 24, 2006, to perfect the claim for abatement of the penalties by providing ROA McNeil with a proper Form 843 accompanied by a payment. If that was not done, the closing letter directed that the IRS compliance function would file the notice of tax lien. Upon closure of the CAP process with the issuance of the May 1, 2006, letter, petitioner's case was returned to RO Davis for monitoring, and the letter advised that petitioner should contact RO Davis with any questions.

In late May 2006 petitioner telephoned ROA McNeil concerning financial hardship she was encountering in securing payment to perfect her Form 843 claim. She indicated that she could remit payment by June 1, 2006. ROA McNeil responded that petitioner could resubmit the Form 843 abatement request with payment at any time and that there existed no deadline for submission of such a claim. Petitioner believed that ROA McNeil spoke for respondent's organization and that the CAP recommendations would be extended as well, even though ROA McNeil advised she should also speak with other of respondent's employees, because she

believed that respondent coordinated all activities concerning New Life's and her trust fund tax liabilities. Petitioner did contact SO White who, because the CAP matter had been closed, informed petitioner that she needed to speak to RO Davis. Petitioner, in her confusion over who had authority over her case, did not do so.

On May 30, 2006, RO Davis inquired of ROA McNeil whether petitioner had submitted a perfected Form 843 claim. ROA McNeil answered in the negative. On June 1, 2006, RO Davis, acting on the CAP recommendations and without further inquiry of petitioner, prepared and filed notices of Federal tax lien against petitioner for the unpaid trust fund penalties. Also on that date, petitioner called ROA McNeil again and told him that she was sending the completed Form 843 and payment. That claim and payment were received by the IRS on June 2, 2006, and handled by ROA McNeil. After receiving petitioner's Form 843 abatement request, ROA McNeil reviewed it, along with information petitioner supplied when she completed the Form 4180, New Life's employment tax returns for the periods at issue, and canceled checks she had signed on behalf of New Life. On June 22, 2006, ROA McNeil issued his decision on petitioner's claim and disallowed petitioner's request for abatement of the trust fund penalties. He also informed her of her right to appeal his

determination with the IRS Office of Appeals or file suit in either a U.S. District Court or the U.S. Court of Federal Claims.

While petitioner's Form 843 abatement request was being reviewed and ultimately denied by ROA McNeil, the IRS, on June 7, 2006, mailed petitioner a Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing under IRC 6320, informing her that notices of Federal tax liens were filed for the unpaid trust fund penalties assessed against her for the tax periods ended September 30 and December 31, 2001, March 31, June 30, and September 30, 2002, and September 30, 2003. The Letter 3172 informed petitioner of her right to appeal the lien filing by submitting a Form 12153, Request for a Collection Due Process Hearing. On July 10, 2006, respondent received petitioner's completed Form 12153 disputing the lien filing. Her collection due process (CDP) lien appeal was assigned to Settlement Officer Bart A. Hill (SO Hill) in the IRS Office of Appeals.

On July 20, 2006, respondent received a letter from petitioner stating she did not agree with ROA McNeil's decision to disallow her Form 843 abatement request for the trust fund penalties and requesting review by IRS Office of Appeals. Her trust fund penalty abatement appeal was also assigned to SO Hill. In a letter dated November 1, 2006, petitioner was instructed that at her CDP hearing she could raise collection alternatives, challenge the appropriateness of the lien filing, challenge the

underlying tax liability if she had not otherwise had a prior opportunity to do so, and raise spousal defenses. She was also informed in that letter that SO Hill was responsible for considering her appeal of her denied Form 843 abatement request.

After filing her appeals requests, on August 22, 2006, petitioner filed an amended offer-in-compromise on behalf of New Life for its unpaid employment tax liabilities. The corporation offered to pay $33,660 at a rate of $330 a month over 102 months, which was the period remaining by statute for the IRS to collect. On or around September 20, 2006, the IRS accepted New Life's August 22, 2006, offer-in-compromise. However, respondent also informed petitioner that she was still personally responsible for the trust fund penalties that had been assessed against her.

On December 5, 2006, SO Hill held a telephone conference with petitioner to discuss the appeal of the lien filing. SO Hill notified her that she was not permitted to discuss her liability for the trust fund penalties at her CDP hearing. However, during the CDP conference, petitioner asserted that the trust fund penalty assessment was invalid. She raised other concerns pertaining to the lien filing with SO Hill, specifically that she had reached an agreement with ROA McNeil to extend the time for perfecting her Form 843, and more generally that the IRS did not follow proper procedures when it failed to send New Life a formal default letter and when it improperly returned New

Life's August 8, 2005, offer-in-compromise.  Finally, she made a general claim that the notice of Federal tax lien for the trust fund penalties should be released.

At the same time, SO Hill also held, concurrent with petitioner's CDP hearing, a conference with petitioner to discuss her Form 843 abatement request appeal.  During the conference SO Hill considered the validity of petitioner's liability for the assessed trust fund penalties.  His consideration consisted of a full review of her status as a responsible person who willfully failed to pay over employment taxes.

On January 30, 2007, SO Hill issued his determination sustaining the denial of petitioner's Form 843 abatement request for trust fund penalties.  He based his determination upon a finding that petitioner was a responsible person who willfully failed to pay over trust fund taxes.

On February 2, 2007, SO Hill issued his determination in which the filing of the Federal tax liens for the trust fund penalties was sustained.  Finding that petitioner had had a prior opportunity to dispute her underlying liability for the trust fund penalties, SO Hill declined to consider petitioner's underlying liability as part of that determination.  His finding that she had had a prior opportunity to dispute the liability was based on the IRS's attempted delivery of the Letter 1153 and his consideration of her Form 843 Appeal.  He also determined through

discussions with SO White and ROA McNeil that neither had granted petitioner an extension of the May 24, 2006, deadline to perfect her Form 843 abatement request. In that regard, petitioner provided SO Hill with permission to conduct ex parte communications with ROA McNeil and SO White. SO Hill did not consider petitioner's concerns with the IRS's mishandling of New Life's offer-in-compromise or respondent's failure to provide formal notice when New Life defaulted on its installment agreement, citing his lack of jurisdiction over matters pertaining to the corporation. Instead, he noted that after accepting a long-term payment offer from the corporation it was appropriate for respondent to file trust fund recovery penalty liens because respondent needed to "protect the government's interest in the taxpayer's assets in case the corporate offer defaults." SO Hill also considered whether any reason existed to release the lien but found no reason to do so and recommended against release.

Finally, SO Hill noted that petitioner had neither supplied him with a collection information statement nor proposed any collection alternatives for her trust fund penalties. He reviewed the procedures followed to file the notice of lien and concluded they were proper. He determined that the notice of lien filing "balances the need for efficient collection of taxes

with the taxpayer's legitimate concern the action is no more intrusive than necessary."

In response to the notice of determination, petitioner timely filed a petition with this Court challenging the decision to sustain the notice of tax lien filing and the denial of her refund claim.

### Discussion[5]

Petitioner's corporation incurred an employment tax liability. Petitioner, an educated and intelligent person, had great difficulty navigating the administrative process to arrange for payment. While she was in the process of dealing with the corporate liability, an assessment was made against her for trust fund tax. Notices of lien were filed with respect to the trust fund assessment, though she argues an agreement to delay had been made. One major reason for petitioner's difficulty was that she had to deal with a different person for each type of procedure concerning the employment tax liability. At one point in the process she was dealing with as many as five of respondent's representatives regarding different aspects of the same underlying tax liability; i.e., offers, installment payments, claim for refund, etc. Respondent's balkanized approach to collection procedures was also detrimental to respondent, because

---

[5]Neither party has raised any question concerning the burden or proof or burden of production in this case. See sec. 7491.

important dates and events were not being internally coordinated. For petitioner, it presented Kafkaesque circumstances and confusion. The administrative record in this case is complex and convoluted. Ultimately, we have sorted out the underlying circumstances and we must decide whether petitioner is entitled to relief from the Appeals officer's determination.

Respondent filed notices of Federal tax lien with respect to petitioner's trust fund tax assessments. See secs. 6321, 6322, and 6323. Section 6320 provides that the Secretary shall furnish taxpayers with written notice of the filing of a notice of lien under section 6323. This notice must be provided not more than 5 business days after the date the notice of lien is filed and must advise the taxpayer of the opportunity for administrative review in the form of a hearing. Sec. 6320(a)(2) and (3). Petitioner has not shown or asserted any omission in the procedures with respect to the filing, or notice with respect to the filing, and none is disclosed in the record.

Section 6320(b) provides taxpayers with the right to request a "Fair Hearing" before an "Impartial" Appeals officer. The hearing generally shall be conducted consistent with the procedures set forth in section 6330(c), (d), and (e). Sec. 6320(c). Section 6330(c)(1) requires the Appeals officer to obtain verification that the requirements of any applicable law or administrative procedure have been met. Under section

6330(c)(2)(A) a taxpayer may raise any relevant issue at the hearing including challenges to "the appropriateness of collection actions" and may make "offers of collection alternatives, which may include the posting of a bond, the substitution of other assets, an installment agreement, or an offer-in-compromise." The taxpayer may also challenge the existence and amount of the underlying tax liability if no notice of deficiency was received or the taxpayer did not otherwise have an opportunity to dispute such tax liability. Sec. 6330(c)(2)(B).

Section 6330(c)(3) provides that a determination of the Appeals officer shall take into consideration the verification under section 6330(c)(1), the issues raised by the taxpayer, and whether the proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the person that any collection action be no more intrusive than necessary. Section 6330(d)(1) allows the taxpayer to appeal a determination to the Tax Court.

Where the underlying tax liability is properly at issue in the hearing, we review that issue on a de novo basis. Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). However, where the underlying tax liability is not at issue, we review the determination for an abuse of discretion. Nicklaus v. Commissioner, 117 T.C. 117, 120 (2001).

I.  Scope and Standard of Review

The Tax Court recently acquired exclusive jurisdiction to review appeals from the Commissioner's lien and levy determinations made after October 16, 2006, irrespective of the type of tax making up the underlying liability.  See Ginsberg v. Commissioner, 130 T.C. 88 (2008); Callahan v. Commissioner, 130 T.C. 44 (2008); McClure v. Commissioner, T.C. Memo. 2008-136.  A taxpayer's "underlying tax liability" includes all "amounts a taxpayer owes pursuant to the tax laws that are the subject of the Commissioner's collection activities."  Callahan v. Commissioner, supra at 49.  Because respondent's determination sustaining the filing of notices of Federal tax lien for unpaid trust fund penalties was issued on February 2, 2007, we are authorized to review the trust fund penalties assessed against petitioner unless precluded by section 6330(c)(2)(B).

Generally, a taxpayer must raise an issue at a collection due process hearing to preserve it for this Court's consideration.  Perkins v. Commissioner, 129 T.C. 58, 63 (2007) (de novo review); Magana v. Commissioner, 118 T.C. 488, 493 (2002) (abuse of discretion review); sec. 301.6330-1(f)(2), Q&A-F5, Proced. & Admin. Regs.[6]  At her hearing, held in conjunction

_____

[6]We recently held that a matter the Appeals officer should have considered under sec. 6330(c)(1) was before us for review regardless of whether the taxpayer raised it with the Appeals officer.  Hoyle v. Commissioner, 131 T.C. __ (2008).

with the conference concerning the trust fund penalties, petitioner disputed that she received the Letter 1153 and also contended that she did not willfully fail to pay over the trust fund taxes.[7] The Appeals officer testified that these conferences were held simultaneously and that petitioner contested her liability for the penalties. In these circumstances there is no reason to draw an invisible curtain between issues that have been administratively merged by respondent. As far as petitioner was concerned, her CDP hearing and Form 843 abatement request were being addressed by the same Appeals officer within one proceeding. Moreover, the Appeals officer's explanation of the hearing at trial reflects that he handled both of petitioner's claims concurrently.[8] Petitioner challenged her liability for the trust fund penalties at her hearing. Accordingly, we may consider the merits of that

---

[7]In Giamelli v. Commissioner, 129 T.C. 107, 114 n.5 (2007), we noted that we need not address "whether a taxpayer, having raised one issue with respect to his or her underlying liability in a collection review hearing, may then raise new and different issues with respect to the underlying liability for the first time on appeal of respondent's determination before this Court." Because we have found that petitioner raised all the issues before us at her CDP hearing, we need not address this issue.

[8]At trial SO Hill attempted to explain how he addressed petitioner's claims simultaneously, yet separately. At best, his testimony was confused and convoluted as to how he denied petitioner the opportunity to raise her underlying liability while, at the same time, reviewing her challenge to the trust fund penalty assessments.

assessment provided she was not statutorily precluded from raising it during her CDP appeal.

A taxpayer cannot challenge an underlying liability in a CDP hearing, and therefore this Court cannot review that liability, if the taxpayer received a notice of deficiency or otherwise had an opportunity to dispute the underlying liability. Sec. 6330(c)(2)(B). Because the assessments against petitioner were trust fund penalties, respondent would not have issued and mailed a notice of deficiency. See sec. 6212(a). The question is whether petitioner "otherwise [had] an opportunity to dispute" the trust fund penalty assessments. The Appeals officer concluded that petitioner had such an opportunity when respondent mailed a Letter 1153 to her. Similarly, respondent argues that the Letter 1153 was sent by certified mail to petitioner's last known address and that petitioner did not avail herself of her opportunity to contest the proposed assessment within the time prescribed by the letter. On these facts, respondent asserts that petitioner was barred from challenging her underlying liability before the Appeals officer.

A section 6672(b)(1) notice provides a taxpayer with the means for protesting a proposed trust fund penalty assessment administratively with the Commissioner. It follows that where a taxpayer has not received a section 6672(b)(1) notice, then that taxpayer has missed an opportunity to dispute the underlying tax

liability.[9]  Documentary evidence of mailing may suffice as proof that a notice of deficiency was properly mailed to a taxpayer. Coleman v. Commissioner, 94 T.C. 82, 90-91 (1990).  When a Letter 1153 is mailed, the Commissioner must follow the same mailing procedures that are provided for notices of deficiency in section 6212(b).  Sec. 6672(b)(1).  It follows that the same evidence that establishes that the Commissioner mailed a notice of deficiency to a taxpayer's last known address should be sufficient to establish that the Commissioner properly sent a Letter 1153.  See Hickey v. Commissioner, T.C. Memo. 2009-2. Respondent has established that a Letter 1153 was mailed, by certified mail, to petitioner's last known address, as required by section 6672(b)(1).[10]

---

[9]This result is compatible with the law involving notices of deficiency.  To be effective, a notice of deficiency need not be received by a taxpayer; instead, it must be shown that the Commissioner sent it to a taxpayer's last known address.  Sec. 6212(a) and (b); Weber v. Commissioner, 122 T.C. 258, 263 (2004); Pietanza v. Commissioner, 92 T.C. 729, 735-736 (1989), affd. without published opinion 935 F.2d 1282 (3d Cir. 1991).  In contrast, when Congress enacted the collection due process statute, it determined that a higher standard should apply and that taxpayers had to receive a notice of deficiency before they would be precluded from raising their underlying liability at their CDP hearing.  Sec. 6330(c)(2)(B).  Therefore, our conclusion that a taxpayer must receive a Letter 1153 fits within the intent of Congress's collection due process laws.

[10]While respondent did not present a U.S. Postal Service Form 3877, there is sufficient evidence in the record that respondent sent a Letter 1153 by certified mail to petitioner's last known address.

The record also reflects that the letter was returned to respondent undelivered and marked "unclaimed". Petitioner's circumstances are therefore distinguishable from those of the taxpayers in McClure v. Commissioner, T.C. Memo. 2008-136, and Pelliccio v. United States, 253 F. Supp. 2d 258 (D. Conn. 2003). The taxpayer in McClure received a Letter 1153 and contested his liability in response. This Court held that that was his opportunity to dispute the trust fund penalty assessment. Likewise, in Pelliccio the taxpayer received a Letter 1153 before each assessment, and the District Court concluded that the taxpayer had the requisite opportunity. We conclude that a section 6672(b)(1) notice that was not received, but not deliberately refused, by a taxpayer does not constitute an opportunity to dispute that taxpayer's liability.

We note that during the prolonged course of her dealings with respondent, petitioner received numerous notices and documents from respondent, some by certified mail. She not only received them, but unlike the taxpayer in Sego v. Commissioner, 114 T.C. 604 (2000), she responded or took other appropriate action in response to them.[11] The Letter 1153 was the sole instance where petitioner made no response nor took other action.

---

[11]For instance, petitioner hand-delivered payments to respondent. In her dealings with respondent she attended meetings that either she or respondent scheduled. She never raised frivolous arguments or employed tactics solely for delay.

Further, respondent has neither argued nor presented any evidence that petitioner refused delivery of the Letter 1153.

We recently addressed what it means to "otherwise have an opportunity to dispute" a tax liability in the context of section 6330(c)(2)(B).  See Perkins v. Commissioner, 129 T.C. 58 (2007); Lewis v. Commissioner, 128 T.C. 48 (2007).  Neither the Internal Revenue Service Restructuring and Reform Act of 1998 (RRA), Pub. L. 105-206, sec. 3401, 112 Stat. 746, nor the Internal Revenue Code defines what Congress intended by the phrase "otherwise have an opportunity to dispute" a tax liability.  The Commissioner has defined this phrase to some extent by promulgating a regulation indicating that an opportunity "includes a prior opportunity for a conference with Appeals".  Sec. 301.6330-1(e)(3), Q&A-E2, Proced. & Admin. Regs. (emphasis added).

The Commissioner's limited definition leaves open the opportunity for deciding what other circumstances do or do not constitute an "opportunity".  Lewis v. Commissioner, supra at 55.  Regarding this subject, this Court has explained:

> As we see it, if Congress had intended to preclude only those taxpayers who previously enjoyed the opportunity for judicial review of the underlying liability from raising the underlying liability again in a collection review proceeding, the statute would have been drafted to clearly so provide.  The fact that Congress chose not to use such explicit language leads us to believe that Congress also intended to preclude taxpayers who were previously afforded a conference with the Appeals Office from raising the underlying liabilities again in a collection review hearing and before this Court.

Id. at 61.  We concluded our analysis by holding that "A conference with the Appeals Office provides a taxpayer a meaningful opportunity to dispute an underlying tax liability." Id.

In his determination sustaining the filing of the notice of tax liens, the Appeals officer decided that petitioner had had an opportunity to dispute her liability for the trust fund penalties when he reviewed her Form 843 abatement request.  We find the Appeals officer's conclusion unsupportable.  As explained in Perkins v. Commissioner, supra at 65, section 6330(c)(2)(B) "utilizes the past tense in reference to the opportunity to dispute, indicating that Congress contemplated that the dispute opportunity would have already transpired when the hearing under section 6330 occurred."  It was also noted that the Commissioner's regulation specifies that a prior conference with Appeals is an opportunity to dispute a liability.  Id.  The analysis and reasoning we applied in Perkins is equally applicable to petitioner's situation.  Petitioner's concurrent appeal of the denial of her abatement request was not an "opportunity" as contemplated by section 6330(c)(2)(B).  To hold otherwise would unduly limit judicial review.  Accordingly, a simultaneous collection due process appeal and underlying tax liability appeal is not an "opportunity" to contest the

underlying tax liability within the meaning of section 6330(c)(2)(B).

To challenge the propriety of the proposed lien filing, petitioner filed an appeal with respondent's CAP. The CAP Settlement Officer, an Appeals officer, was fully aware of petitioner's pending Form 843 abatement request. The CAP Settlement Officer did not consider petitioner's underlying tax liability and instead focused her review solely on the propriety of the proposed notice of lien filing.[12] Petitioner's CAP prelien filing hearing did not rise to the level of an "opportunity to dispute" her underlying tax liability where the Appeals officer limited her review to the propriety of filing the notice of liens.

Where a taxpayer has not received a notice of deficiency or had an opportunity to contest her liability and raises her underlying liability at her CDP hearing, we review the underlying liability. Sec. 6330(c)(2)(B); see, e.g., Bach v. Commissioner, T.C. Memo. 2008-202, affd. without published opinion 103 AFTR 2d 1340, 2009-1 USTC par. 50,286 (4th Cir. 2009). Where a taxpayer is incorrectly advised at a CDP hearing that she had a prior opportunity to contest her underlying liability, we consider the

_____

[12]It is clear from the record that petitioner raised her concern that she did not receive the Letter 1153, but that SO White solely focused petitioner's CAP hearing on the propriety of the proposed notice of lien filing.

underlying liability.  Petitioner raised the underlying liability, and it was reviewed and considered in her abatement hearing.  The Appeals officer conducting petitioner's CDP hearing mistakenly believed she had had a prior opportunity to raise her underlying tax liability.  We find that petitioner did not have an opportunity to dispute her liability for the trust fund penalty assessments before her CDP hearing with SO Hill.  Petitioner's liability for the trust fund penalties is accordingly before this Court for de novo review.

II.  <u>Trust Fund Penalty</u>

Section 6672 imposes a penalty for the willful failure to collect, account for, and pay over income and employment taxes of employees.  Income and employment tax withholding is commonly referred to as "trust fund tax" because the Internal Revenue Code characterizes such withholding as a "special fund in trust for the United States."  Sec. 7501(a).  As set forth in section 6671, penalties for the failure to collect, account for, and pay over trust fund taxes are assessed and collected in the same manner as tax against a person including "an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform" the duties referred to in section 6672.  Sec. 6671(b).  Such persons are referred to as "responsible persons" and the term may be broadly applied.  See generally <u>Logal v. United States</u>, 195 F.3d

229, 232 (5th Cir. 1999); Barnett v. IRS, 988 F.2d 1449, 1454 (5th Cir. 1993).

A trust fund penalty may be assessed against any responsible person and is separate from the employer's liability for the unpaid income and employment taxes. Sec. 6672(a); Howard v. United States, 711 F.2d 729, 733 (5th Cir. 1983). While there is no requirement that the Commissioner pursue collection of the taxes from the employer before assessing the penalty against a responsible person, as a matter of policy the Commissioner does not pursue collection of the penalty where the employer pays its liability. Hornsby v. IRS, 588 F.2d 952, 954 (5th Cir. 1979).[13]

A. Preliminary Notice

Generally, before a section 6672 penalty may be assessed, the Commissioner must mail a Letter 1153 to the responsible person's last known address advising that a trust fund penalty will be assessed. Sec. 6672(b)(1).[14] While we determined petitioner did not have an opportunity to contest her liability for the penalties because she did not receive the Letter 1153, we

_____

[13]According to the Service's Policy Statement P-5-14, "The withheld income and employment taxes or collected excise taxes will be collected only once, whether from the business, or from one or more of its responsible persons." 1 Administration, Internal Revenue Manual (IRM) (CCH), pt. 1.2.14.1.3(2), at 2404 (June 9, 2003).

[14]The exception is where the Commissioner determines that collection of the penalty is in jeopardy. Sec. 6672(b)(4). Respondent does not assert that the penalty was in jeopardy of collection; therefore, this exception does not apply.

arrived at that determination by applying the standard established in section 6330(c)(2)(B).  Whether the Government must ensure that a taxpayer actually receives a Letter 1153 or whether it is sufficient for the Government to show it timely mailed the notice to a taxpayer's last known address in order for the assessment to be valid is a question recently addressed by this Court.  We concluded that the mailing of section 6672 notification to a taxpayer's "last known address" would be sufficient to advise a responsible officer of the assertion of a trust fund penalty.  See Hickey v. Commissioner, T.C. Memo. 2009-2.  In Hickey we held that where the notice has been mailed to the taxpayer's last known address, it is not necessary for the taxpayer to receive the notice before the Commissioner can assess the trust fund penalty.  A bankruptcy court reached the same conclusion in In re Chabrand, 301 Bankr. 468, 476-477 (Bankr. S.D. Tex. 2003).

The other means of providing notice to a taxpayer pursuant to section 6672(b)(1) is by personal service.  This option was added to the statute in 1998 with the enactment of RRA sec. 3307, 112 Stat. 744.  A Senate Finance Committee report explains the addition to the statute and states, in a parenthetical to the explanation, that "In some cases, personal delivery may better assure that the recipient actually receives notice."  S. Rept. 105-174, at 66 (1998) 1998-3 C.B. 537, 602.  The Committee's

explanation implies that Congress added personal delivery as an option for the Commissioner that would "better assure" receipt of the notice, thereby acknowledging that mailing notice to the taxpayer's last known address does not guarantee receipt. The delivery methods are alternatives, and the statute permits the Commissioner to choose which method to use; thus, we have concluded that Congress did not require the Commissioner to ensure that a taxpayer actually receive the notice.

Accordingly, proper mailing of a preliminary notice to the last known address is sufficient to comply with section 6672(b)(1). In this case the notice requirement of the statute was satisfied by respondent's certified mailing of a Letter 1153 to petitioner's last known address.

B. Burden of Proof

The parties have not raised the issue of who bears the burden of proof in this proceeding. Generally, the burden of proof is upon the taxpayer. Sec. 7453; Rule 142(a). Section 7491(a), providing for a shift to the Commissioner of the burden of proof in certain circumstances, is inapplicable to trust fund penalty cases.[15] In any event we find on a preponderance of the evidence that employment taxes were not paid, that petitioner was

---

[15]Sec. 7491(a)(1) provides that the burden of proof may be shifted to the Commissioner, provided that certain requirements are met, for "any tax imposed by subtitle A or B". The sec. 6672 trust fund penalty is imposed by subtit. F of the Internal Revenue Code.

a responsible person, and that she willfully failed to pay over those taxes.

### C. Responsible Person

Liability is imposed upon all persons responsible for collecting, accounting for, or paying over employment withholding taxes.[16] The Court of Appeals for the Fifth Circuit, to which this case is appealable, "generally takes a broad view of who" qualifies as a "responsible person under § 6672." Gustin v. United States, 876 F.2d 485, 491 (5th Cir. 1989). It is one's duties, status, and authority that define him as a responsible person. Turnbull v. United States, 929 F.2d 173, 178 (5th Cir. 1991); Gustin v. United States, supra at 491. A delegation of that duty to others does not necessarily change that person's status as a responsible person. Turnbull v. United States, supra at 178. Further, an individual may be a responsible person even though he did not know that withholding taxes were not being paid over to the Government. Barnett v. IRS, 988 F.2d at 1454.

The Court of Appeals for the Fifth Circuit considers the following to be indicia of a responsible person: (i) Holding the position of officer or member of the board of directors; (ii)

---

[16]The U.S. Supreme Court explained that responsibility for collecting, truthfully accounting for, and paying over employment taxes must be read disjunctively because Congress did not intend to limit liability for trust fund taxes "to those persons in a position to perform all three of the enumerated duties". Slodov v. United States, 436 U.S. 238, 250 (1978).

substantial ownership of the business; (iii) possessing the authority to hire and fire employees; (iv) managing the day-to-day operations of the business; (v) deciding how to disburse funds and pay creditors; and (vi) possessing the authority to sign checks for the business. Id. at 1455. "No single factor is dispositive." Id. In applying these indicia, there may be, and often are, more than one responsible person within each business. Id. However, for purposes of imposing liability for trust fund penalties, it does not matter how many responsible persons there are, or who is the most responsible, because the statute applies equally to all responsible persons. Id. Therefore, we must determine only whether petitioner is a responsible person.

During the periods at issue petitioner was the president, treasurer, and an employee of New Life. She was also the majority (75 percent) shareholder of the corporation. She admits she had the ability to and did exercise her right to hire and terminate employees. Petitioner was a signatory on New Life's checking account. There is considerable evidence that she signed most of the checks for New Life. There is evidence she was involved in managing the corporation although that responsibility was shared with others. She concedes that she had "overall management" responsibilities for the corporation. Finally, petitioner admits that she had the authority to direct the

payment of corporate funds, and there is ample evidence she exercised that authority.

It is clear on the basis of her admissions that petitioner possessed, albeit in varying degrees, all six of the indicia of a responsible person. There is ample evidence to support the conclusion that petitioner was a responsible person, for purposes of section 6672.

D. Willfulness

A responsible person will be held liable for the penalty only where that failure to pay over withholding tax was willful. The Court of Appeals for the Fifth Circuit has determined that "willful", in the context of section 6672, does not mean the responsible person must have a "criminal or other bad motive * * *, but simply a voluntary, conscious and intentional failure to collect, truthfully account for, and pay over the taxes withheld from the employees." Newsome v. United States, 431 F.2d 742, 745 (5th Cir. 1970). To establish willfulness, there is no requirement that the responsible person have intended to deprive the Government of the withholding tax. Id. at 747. However, willfulness is established where the "responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government". Mazo v. United States, 591 F.2d 1151, 1154 (5th Cir. 1979). While willfulness is typically proven by evidence that a responsible person paid

other creditors when withholding tax was due to the Government, mere negligence is not sufficient to establish willfulness. Gustin v. United States, supra at 492.

Delegation of the responsibility to handle trust fund taxes appropriately is not proof that the responsible person was not willful. Hornsby v. IRS, 588 F.2d at 953. "Responsible persons owe a fiduciary obligation to care properly for the funds that are temporarily entrusted to them for the ultimate use of the United States." Id. A responsible person's fiduciary duty remains with him even where he has delegated responsibility for discharging that duty to a subordinate. Id.

Petitioner admits that as early as March 2002 she became aware that New Life had not been paying over its trust funds to the Government. Petitioner employed a bookkeeper who was responsible for preparing New Life's Form 941, Employer's Quarterly Federal Tax Return, and remitting payment along with these returns. For all periods at issue petitioner signed the quarterly employment tax returns reflecting an unpaid liability for employment taxes. She does not recall whether at the time she signed these returns they were blank or had been completed by the bookkeeper. There is evidence petitioner signed checks paying for the corporation's rent and insurance, as well as an "advance" payable to herself. These payments were made

before and after she became aware of the corporation's unpaid employment tax liability.

Petitioner's delegation of the duty to prepare and remit the employment tax returns and payments does not insulate her from liability. Her defense is that she was unaware of the bookkeeper's failure to remit the employment taxes. Petitioner did, however, become aware during March 2002, if not sooner, that the corporation had not been paying over these taxes. Other creditors were paid despite New Life's liability to respondent and its failure to remit employment taxes continued for the quarters ended March 31, June 30, and September 30, 2002, and September 30, 2003. Petitioner's authorization of payment to other New Life creditors after becoming aware that employment taxes were unpaid is indicative that as a responsible person her "conduct was willful as a matter of law." See Mazo v. Commissioner, supra at 1157.

Even though petitioner was distracted and pressured by business problems and responsibilities, her failure to discharge the outstanding obligations to the Government is not thereby excused. We can draw only one conclusion from these facts: Petitioner's failure to pay over employment taxes was "willful".

E. Reasonable Cause

Finally, the Court of Appeals for the Fifth Circuit recognizes that a taxpayer may avoid liability for a trust fund

penalty by showing reasonable cause for a failure to collect, account for, or pay over trust fund taxes.  <u>Newsome v. United States</u>, <u>supra</u> at 746-747; <u>Frazier v. United States</u>, 304 F.2d 528, 530 (5th Cir. 1962).  It is a very limited exception to a finding of willfulness.  <u>Logal v. United States</u>, 195 F.3d at 233; <u>Bowen v. United States</u>, 836 F.2d 965 (5th Cir. 1988); <u>Newsome v. United States</u>, <u>supra</u> at 747.  While reasonable cause is a defense, conceptually, the Court of Appeals has stated that "no taxpayer has * * * carried that pail up the hill."  <u>Id.</u>  Further, reasonable cause is not a defense where a responsible person "knew that the withholding taxes were due, but * * * made a conscious decision to use corporate funds to pay creditors other than the government."  <u>Logal v. United States</u>, 195 F.3d at 233.

While petitioner does not assert the reasonable cause exception applies to her, we consider its applicability. Petitioner concedes that she knew withholding taxes for New Life were due.  Additionally, the record contains considerable evidence she paid other creditors after becoming aware of the corporation's unpaid liability for employment taxes.  Thus, we find that a defense of reasonable cause is not available to petitioner.

III.  <u>Collection Due Process Appeal</u>

Having found petitioner liable for the trust fund penalties, we turn to other aspects of respondent's notice of

determination upholding the filing of the notices of lien against petitioner.  A section 6330 hearing is to be conducted by an officer or employee of the Commissioner's Appeals Office who has had no prior involvement with respect to the tax in controversy. Sec. 6330(b)(1), (3).  The Appeals officer or employee is required to verify that the requirements of any applicable law or administrative procedure have been met.  Sec. 6330(c)(1).  At the hearing, the taxpayer may raise "any relevant issue relating to the unpaid tax".  Sec. 6330(c)(2)(A).  At the conclusion of the hearing, the Appeals officer must determine whether and how to proceed with collection and shall take into account:  (i) The verification that the requirements of any applicable law or administrative procedure have been met; (ii) the relevant issues raised by the taxpayer; (iii) challenges to the underlying tax liability by the taxpayer, where permitted; and (iv) whether any proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that the collection action be no more intrusive than necessary. Sec. 6330(c)(3).

In regard to matters other than the tax liability, our standard for review of an Appeals officer's determination concerning a collection due process hearing is generally whether there has been an abuse of discretion, a standard which the Court of Appeals for the Fifth Circuit also applies when it reviews

such aspects of collection due process cases. Christopher Cross, Inc. v. United States, 461 F.3d 610, 612 (5th Cir. 2006). This Court will find an abuse of discretion has occurred in collection due process cases where the exercise of discretion is without sound basis in fact or law. See Freije v. Commissioner, 125 T.C. 14, 23 (2005); Ansley-Sheppard-Burgess Co. v. Commissioner, 104 T.C. 367, 371 (1995). The Court of Appeals for the Fifth Circuit has adopted a similar test for whether an abuse of discretion has occurred. Christopher Cross, Inc. v. United States, supra at 612 (defining an abuse of discretion as "clear taxpayer abuse and unfairness by the IRS"); see Burnett v. Commissioner, 227 Fed. Appx. 342, 343 (5th Cir. 2007) (citing Cross and stating that the court is "applying the same abuse-of-discretion standard as the Tax Court" (emphasis added). We, therefore, proceed by considering whether respondent's determination, insofar as related to matters other then petitioner's challenge to her underlying liabilities, was an abuse of discretion.

Petitioner challenged the propriety of the Appeals officer's determination on three grounds: (1) Respondent never mailed her the Letter 1153; (2) notification was not sent to New Life advising it had defaulted on an installment agreement with respondent for payment of the employment tax liability; and (3) a notice of lien was filed against petitioner despite an agreement not to file the notice within a certain period and

despite petitioner's having informed respondent that the $2,927 payment needed to institute the refund abatement could not be made until 1 week after the agreed time.

We held that petitioner did not receive the Letter 1153, and we reviewed her underlying liability. Our finding that petitioner did not receive the Letter 1153 did not invalidate the trust fund penalty assessment. Petitioner has not raised any other issue with respect to respondent's determination to assess the trust fund penalty, and nothing in the record would cause us to invalidate the assessment.

Petitioner next contends that the decision to proceed with filing a notice of lien was in error because she was not advised that New Life had defaulted on its installment agreement.[17] At her CDP hearing and at trial petitioner also raised her concern that New Life's offers-in-compromise had been inappropriately rejected. As we understand petitioner's argument, she is asserting that respondent's mishandling of these administrative

---

[17]On Mar. 3, 2004, New Life and respondent entered into an installment agreement for payment of its employment tax liabilities. Respondent admits that an employee agreed not to pursue the trust fund penalties against petitioner as long as certain conditions were met, including New Life's timely payment of the amounts agreed to under the installment agreement. Petitioner does not contend that the installment payments were made; instead, she asserts that respondent should have notified her of the default and failed to do so.

tasks led respondent to pursue trust fund penalties against her.[18]

Respondent's handling of the installment agreement default or of the offers-in-compromise with New Life has no direct bearing on petitioner's case. Whether or not New Life was paying a portion of its liability under an offer-in-compromise or installment agreement, respondent had discretion to collect the unpaid trust fund tax by pursuing a penalty against petitioner as a responsible person.[19] Because the pursuit of the trust fund penalties against petitioner was within respondent's discretion,

---

[18]As previously noted, petitioner was impeded by the fact that respondent had as many as five different employees dealing with her regarding the employment tax and trust fund penalties for the same tax periods. These circumstances do not constitute an abuse of discretion. It is possible, however, that petitioner would have encountered less confusion and there might have been an administrative resolution of this case if she had been able to deal with a single point of contact concerning the employment tax.

[19]It is the Service's policy that the amount offered to compromise a liability subject to assertion of the TFRP will represent what can be collected from the employer. If the Service enters into a compromise with an employer for a portion of the trust fund tax liability, the remainder of the trust fund taxes may still be collected from a responsible person pursuant to Section 6672 of the Internal Revenue Code.

1 Administration, IRM (CCH), pt. 5.8.4.13.2(2), at 16.349-11 (Sept. 23, 2008); see also Hult v. Commissioner, T.C. Memo. 2007-302; sec. 301.6159-1(d)(3), Proced. & Admin. Regs. (stating the Commissioner may file a lien while a taxpayer has an installment agreement in place as long as the terms of the agreement do not provide otherwise).

we cannot, on that basis, conclude respondent abused his discretion.

Petitioner's final argument is that respondent should not have filed the liens once she submitted the necessary payment with her Form 843 abatement request. The CAP officer gave petitioner until May 24, 2006, to perfect her Form 843 abatement request and agreed not to file the notice of lien until a decision was reached on her abatement request. Petitioner, however, did not submit the payment to perfect her abatement request until June 2, 2006. Petitioner and respondent disagree as to whether petitioner was given the impression that the lien filing would be held in abeyance even though she missed the May 24 deadline. Whether petitioner was or was not granted additional time to perfect her abatement request has no bearing on the appropriateness of respondent's decision to file notices of tax lien. The Commissioner may proceed with filing a tax lien after a tax has been assessed, notice and demand has been given, and a taxpayer has refused or neglected to pay. Sec. 6321. There is no legal prohibition to filing a notice of Federal tax lien while a taxpayer is seeking administrative review of the underlying liability.[20] Respondent's decision to proceed with

---

[20]Unlike notice of lien filings, the Commissioner is prohibited from pursuing a levy where a taxpayer satisfies the requirements of sec. 6672(c). Included in the list of requirements is that the taxpayer file a refund/abatement

(continued...)

filing the lien was well within the bounds of respondent's discretion.

The Appeals officer verified that respondent had complied with all legal and procedural requirements pertaining to the proposed lien. Petitioner did not challenge the appropriateness alternative. Also, petitioner did not raise any other defenses to collection. Finally, as explained in the notice of determination, the Appeals officer took into account whether any proposed collection action balanced the need for the efficient collection of taxes with the legitimate concern of petitioner that the collection action be no more intrusive than necessary. See sec. 6330(c)(3). Consequently, the Appeals officer determined the filing of a notice of lien was legally and procedurally correct.

The Appeals officer's determination to uphold the lien is sustained.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.

---

[20](...continued)
request. Sec. 6672(c)(1)(B); 1 Administration, IRM (CCH), pt. 5.7.7.6.2(1), at 16,216 (Apr. 13, 2006).