T.C. Memo. 2016-199

UNITED STATES TAX COURT

CHRISTINA M. FITZPATRICK, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9433-13L.                    Filed November 2, 2016.

Keith H. Johnson, Adam L. Heiden, and Michael P. Tyson, for petitioner.

Anne M. Craig, Lauren B. Epstein, and Peter T. McCary, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, Judge:  This case arises from a petition for judicial review filed in response to a Notice of Determination Concerning Collection Action(s) Under Section 6320 and/or 6330 (notice of determination) in which respondent determined to sustain a lien filing with respect to petitioner's liabilities listed

[*2] below.[1]  Respondent determined that petitioner was liable for trust fund

recovery penalties (TFRPs) for each of the following periods:

| Taxable period | TFRP assessed amount |
|---|---|
| 9/30/2008 | $16,204.47 |
| 12/31/2008 | 11,385.64 |
| 3/31/2009 | 12,644.96 |
| 6/30/2009 | 10,098.12 |
| 9/30/2009 | 9,530.90 |
| 12/31/2009 | 13,640.81 |
| 3/31/2010 | 13,742.42 |
| 6/30/2010 | 12,446.32 |
| 9/30/2010 | 12,427.09 |
| 12/31/2010 | 13,969.58 |
| 3/31/2011 | 12,805.54 |

The issue for decision is whether petitioner is liable for the TFRPs assessed

against her.  We hold that she is not.

FINDINGS OF FACT

Some of the facts have been stipulated.  Respondent reserved objections to

several paragraphs in the stipulations of fact and attached exhibits based on

relevancy, materiality, and hearsay.[2]  We need not and will not address those

---

[1]  Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times.

[2]  In the third supplemental stipulation of facts respondent reserved
objections to paragraphs 42, 43, 44, and attached Exhibits 23-J, 24-J, and 25-J.  In
the fourth supplemental stipulation of facts respondent reserved objections to

(continued...)

**[*3]** objections because in resolving the issues presented we have not relied on any of the paragraphs or exhibits to which respondent reserved those objections. All remaining stipulated facts are so found, and the remaining attached exhibits are incorporated by this reference. At the time the petition was timely filed, petitioner resided in Florida.

Background

In 2004 James Stamps read an article in the Jacksonville Business Journal about a restaurant and wine bar franchise called the Grape. He later dined at one of the Grape's location's in Atlanta, Georgia. He was intrigued by the idea of owning a restaurant and wine bar and thought that purchasing the franchise rights for the Jacksonville, Florida, area would prove to be lucrative. Mr. Stamps contacted petitioner's husband, Edward Fitzpatrick, and proposed that they jointly purchase the franchise rights and open a location at a new mall in Jacksonville.[3]

Mr. Stamps and Mr. Fitzpatrick agreed they would be equal partners. Mr. Stamps would be the president and managing partner overseeing the business operations while Mr. Fitzpatrick would be a silent partner and passive investor

---

[2](...continued)
paragraph 59 and the attached Exhibit 31-J.

[3] Mr. Stamps was Mr. Fitzpatrick's previous supervisor when both worked for a beverage distributor in Jacksonville.

**[\*4]** with some executive authority but no day-to-day duties.[4]  Petitioner had no ownership interest in the business.[5]

Petitioner's primary responsibility during the periods at issue was to serve as caregiver to her disabled son Evan,[6] who suffers from a rare metabolic disorder called citrullinemia.  As a result of the disorder, Evan has severe autism, cerebral palsy, and limited mobility.  Evan is also speech impaired and needs assistance to perform many basic functions such as eating and going to the bathroom.  He has a low IQ and a life expectancy of 33 years.  He is required to take over 50 pills a day and cannot be left for any significant amount of time without adult supervision.  Because of the substantial amount of attention Evan required, petitioner was unable to devote significant effort to any business enterprise.

---

[4]  Mr. Fitzpatrick worked in excess of 70 hours per week at his job managing operations at a beverage distributor.  He therefore had little time to participate in activities at the Grape.

[5]  Respondent attempts to characterize petitioner as a part owner of the business (1) by virtue of her marriage to Mr. Fitzpatrick; (2) because she had prior unrelated work experience; and (3) because she was allegedly perceived to be an owner by a few individuals.  Respondent does not cite convincing authority or other relevant evidence in the record in support of this proposition, so we decline to make such a finding.

[6]  Evan was born in 1996.

[*5] <u>Preopening Activities at the Grape</u>

Once Mr. Stamps and Mr. Fitzpatrick decided to go ahead with the investment, a for-profit corporation known as Dey Corp., Inc. (Dey Corp.), was incorporated and registered with the Florida secretary of state in August 2004. Dey Corp. was the corporate entity used to purchase and operate the Grape franchise. Mr. Stamps was the only person listed in the articles of incorporation as an officer and director.

Shortly after Mr. Stamps and Mr. Fitzpatrick began engaging in preliminary business matters, Mr. Stamps was unexpectedly hired for a short-term job at a beverage distributor in Puerto Rico. Therefore most of the preopening responsibilities fell upon Mr. Fitzpatrick. Because of his busy schedule, Mr. Fitzpatrick directed petitioner to carry out some of those responsibilities. Preopening responsibilities involved checking the site premises during construction and resolving permitting issues.

Mr. Stamps returned from Puerto Rico in January 2005, shortly before the Grape opened for business. Construction of the restaurant was progressing and key employees needed to be hired and trained. Mr. Stamps and Mr. Fitzpatrick conducted interviews and hired a retail manager, a wine bar manager, and a chef

**[\*6]** (new employees). Petitioner was not involved in the interviewing and hiring process.

For several weeks spanning January and February 2005 Mr. Fitzpatrick, Mr. Stamps, and the new employees went to the Grape headquarters in Atlanta for training. Petitioner did not attend the training. While in Atlanta, Mr. Stamps contacted petitioner and asked her to retain the services of a payroll company so the new employees could be paid. Petitioner engaged the services of a payroll company called Paychex.

Paychex offered several levels of service including a service called "Taxpay" which provided full payroll support. In addition to preparing employee paychecks and determining payroll tax liability, Paychex would debit the business' bank account; directly deposit Federal payroll taxes; and electronically file Forms 941, Employer's Quarterly Federal Tax Return. Dey Corp. contracted for this comprehensive payroll service.

During the preopening phase petitioner was also directed to open a corporate bank account on behalf of Dey Corp. She opened an account at Wachovia Bank (Wachovia account). Petitioner had signatory authority on the Wachovia account.

[*7] Management Structure at the Grape

The Grape opened in March 2005 and was run primarily by Mr. Stamps[7] and Kris Chislett[8]. Mr. Stamps carried out his role as president of the corporation in varying degrees. He was heavily involved in the initial hiring and business structuring and became slightly less involved during periods when he was away from Jacksonville.[9]

On his résumé, Mr. Stamps described his position at the Grape from 2004 to 2011 as "Owner/Operations Manager". Specifically, Mr. Stamps indicated that he "drove all aspects of building business from the ground up, including negotiations for franchise and construction contracts; supervised construction. Hired, trained,

---

[7] Before opening the Grape, Mr. Stamps had a lengthy career in business and management. He has a bachelor of arts degree in biochemistry and started working for Allegheny Pepsi-Cola in 1980. He later served for nine years as the vice president of operations with Southeast Atlantic Beverage Corp., where he oversaw the beverage operations of three different facilities in Miami, Jacksonville, and Atlanta. His resume lists various areas of expertise including "Strategic Planning", "Tactical Execution", "Project/Program Management", "Inventory Management", and "Financial Mgmt./P&L".

[8] Mr. Chislett was originally hired as the Grape's retail manager but was quickly promoted to general manager, the position he held during the periods at issue. Mr. Chislett has a bachelor of arts degree in hospitality business management.

[9] Mr. Stamps worked in Trinidad, West Indies, for a brewing company between 2007 and 2009 but managed the Grape remotely and returned to Jacksonville often.

**[*8]** and supervised staff of 16. Maintained high quality and customer satisfaction levels while managing and containing wine and food costs." When he was in Jacksonville, Mr. Stamps oversaw day-to-day operations. During 6 of the 11 quarters at issue when Mr. Stamps was in Trinidad, he was in constant contact with Mr. Chislett, with whom he discussed daily business dealings. Mr. Stamps also monitored the Grape's bank balances and determined when it was appropriate to lend money to the business.

Mr. Chislett, the general manager of the Grape, was responsible for carrying out the day-to-day business operations. He managed the employees, paid creditors, and oversaw purchases from vendors. He was responsible for hiring and firing personnel. Mr. Chislett was also Paychex's main contact during the periods at issue, and he maintained control over the payroll process. On his résumé, Mr. Chislett stated that his responsibilities included:

> Management and oversight of all restaurant, with duties including; recruitment and selection of personnel, training, purchasing, inventory, sales strategies and yield management, reviewing financial statements, P&L, product mix, budgeting, forecasting revenues and expenses, and management of individual department managers/ supervisors. Supplier relations including; price negotiation, negotiation of payment terms and utilisation [sic] of key industry contacts in order to complete tasks.

**[*9]** Petitioner did not have a significant role at the Grape. While she was directed to establish the business' bank account and contract with Paychex during the preopening phase of the business, she became decidedly less involved once the business was operational. Petitioner's main responsibilities were delivering checks, relaying electronic bank account balances to Mr. Chislett, and delivering the business' mail that was sent to her private mailbox.[10] Petitioner occasionally transferred funds to and from the corporate bank account at the direction of Mr. Stamps or Mr. Fitzpatrick. Petitioner also issued checks at the direction of Mr. Stamps or Mr. Fitzpatrick for some of the business' recurring monthly expenses.[11] Petitioner made no operational decisions. Indeed, she did not have the proper education, training, or experience to hold a management position at the Grape.[12]

---

[10] During the preopening phase, when petitioner was directed to contract the payroll service and open the corporate bank account, the mall which would house the Grape was still under construction. Since there was no mailing address available for the business, Dey Corp. received mail at a private mailbox that petitioner maintained for unrelated business purposes.

[11] During the periods at issue petitioner signed roughly 4% of the nonpayroll checks.

[12] Petitioner graduated from high school in 1983. She never enrolled in or completed any college-level courses. For a time, she operated a small rental real estate business overseeing several properties, but she did not otherwise have management experience that would have been valuable to the Grape.

**[*10]** <u>Payroll</u>

As stated earlier, Mr. Chislett maintained control over the payroll process. He was responsible for compiling the payroll information into a spreadsheet and transmitting this information directly to Paychex every week. Because of the quick turnaround between providing the weekly payroll information to Paychex and payday at the Grape on Tuesdays, it was necessary for Paychex to hand-deliver the payroll checks by courier.

Because the Grape had no business location at the time Paychex was first contracted, the payroll checks were initially delivered to Mr. Fitzpatrick's and petitioner's home address. Later, once the business formally opened, Paychex began delivering the payroll checks directly to the business location. However, employees were rarely onsite to receive the payroll checks on Tuesday mornings because the business would not open until later in the day. Therefore, the parties reverted to having the checks delivered to Mr. Fitzpatrick's and petitioner's residence.

Upon delivery of the payroll checks, petitioner was directed to sign the checks and deliver them to the business premises on Tuesday afternoons.[13]

---

[13] When petitioner personally delivered the checks to the business location, she would sometimes not be able to get out of her vehicle because Evan's

(continued...)

[*11] Sometimes an employee would go to petitioner's house to collect the payroll checks.[14]  It was usually necessary for petitioner to sign the checks because Tuesday was Mr. Chislett's day off and there was no one else onsite available to sign the payroll checks.[15]

Petitioner was not responsible for and did not review statements included in the Paychex package.

Operations at the Grape

The Grape opened and began serving customers in March 2005.  Within a year the business was losing money.  As general manager Mr. Chislett was responsible for improving the Grape's sales.  He increased live music performances, spent lavishly on better known entertainers, and purchased larger stocks of wine for the restaurant.

---

[13](...continued)
condition prevented his walking from the vehicle to the restaurant.  Petitioner would have to call an employee to walk outside and collect the payroll checks.

[14]  If Evan required attention and petitioner could not answer the front door, the employee would collect the checks from under the front doormat where they had been delivered by the Paychex courier.

[15]  During the periods at issue, petitioner signed about 81% of the payroll checks.

[*12] Many of Mr. Chislett's sales-generating ideas, however, were not sanctioned by the owners. In fact Mr. Chislett was spending to such an extent that checks he issued to vendors began to bounce. Mr. Chislett was admonished by Mr. Fitzpatrick to reduce his excessive spending.

As a result of the bounced checks, vendors began to lose faith in the business' ability to pay its bills, and many demanded cash on delivery or certified checks. Mr. Chislett therefore began to pay creditors by first using cash received from daily operations. When the cash balance at the restaurant was exhausted, he would resort to using standard checks (if the creditor still accepted standard checks) or certified checks. The owners limited the number of checks available to Mr. Chislett at any one time, presumably in an effort to reign in his spending. Petitioner was directed to deliver to Mr. Chislett a small number of blank nonpayroll checks when she delivered the weekly payroll checks.

In July 2008 the Wachovia account was frozen for reasons that are unclear. Because Mr. Stamps was working in Trinidad, petitioner was directed to open a new bank account. She opened an account with First Guaranty Bank (First Guaranty account).[16]

---

[16] Before opening the account, the bank employee instructed petitioner to indicate she held some form of corporate office on the commercial signature card

(continued...)

[*13] Four months later, in November 2008, Paychex tried to withdraw $1,809.88 from the First Guaranty account for taxes and $328.35 for an invoice. The electronic withdrawals were rejected. This was the last time Paychex attempted to debit any taxes from a Dey Corp. bank account.[17]

Paychex continued to produce payroll checks and reference copies of Forms 941.[18] Furthermore, the payroll checks and Paychex invoices for payroll services

---

[16](...continued)
and on a form titled Bank Resolution by Corporation. Petitioner handwrote "sec" next to her signature on the signature card and she signed the Bank Resolution by Corporation as Dey Corp.'s secretary even though she was never actually secretary for Dey Corp.

[17] In response to a subpoena duces tecum issued for respondent, Paychex produced several letters allegedly issued to Dey Corp. Two letters dated December 2008 and addressed to Dey Corp. state:

> The electronic funds transfer that was generated as part of your recent payroll processing to move funds from your bank account to Paychex was unsuccessful. Therefore Paychex can no longer provide the portion of the payroll processing service that deals with the electronic collection and payment of funds.

A third letter dated January 2009 states that Taxpay service was discontinued effective December 29, 2008. It is unclear from the record whether these letters were in fact mailed to Dey Corp.

[18] The reference copies of Forms 941 prepared by Paychex reflected that there was no balance due and owing and that there was no need to file Forms 941. The signature blocks were printed with the following words: "REFERENCE COPY PREPARED BY PAYCHEX" and "DO NOT FILE".

**[*14]** continued to be debited from the First Guaranty account.  However, Paychex did not debit the payroll tax portion from the account, make payroll deposits on the business' behalf, or file Forms 941.  Petitioner was unaware these services had been canceled.

Business continued at the Grape until early 2011 when Dey Corp. turned operations over to the franchisor.

IRS Investigation and Assessment of Tax

On June 16, 2011, approximately two months after Dey Corp. had stopped operating the Grape, Revenue Officer Lanita Wells (RO Wells) visited the office of Sonny Martin, Dey Corp.'s certified public accountant (C.P.A.).  Because Mr. Martin was not in the office, RO Wells dropped off her card and left word she had been there investigating unpaid payroll taxes.

Mr. Martin sent Mr. Fitzpatrick and petitioner an email notifying them that a representative of the Internal Revenue Service (IRS) had visited his office investigating unpaid payroll taxes.  This email was the first time Mr. Fitzpatrick and petitioner had knowledge that Federal payroll deposits had not been made for various quarters and that Forms 941 remained unfiled.

RO Wells was originally assigned to investigate Dey Corp. but expanded her TFRP investigation to Mr. Stamps, Mr. Chislett, Mr. Fitzpatrick, and

[*15] petitioner. After conducting her investigation, RO Wells recommended assessing TFRPs against Mr. Stamps, Mr. Chislett, and petitioner.[19]

On December 12, 2011, RO Wells sent petitioner a Letter 1153, Trust Fund Recovery Penalty Letter, dated December 9, 2011, via certified mail to her last known address. Petitioner did not receive the Letter 1153 because the U.S. Postal Service did not deliver it and instead returned the envelope to the IRS.[20] Under the terms of the letter petitioner had 60 days to file a formal protest with the IRS contesting the proposed assessment of the TFRPs.

On February 7, 2012, the deadline for filing the formal protest, petitioner and RO Wells had a telephone conversation. At no time during the conversation did RO Wells inform petitioner that a Letter 1153 had been issued to her and returned by the U.S. Postal Service.

On March 19, 2012, the TFRPs were assessed against petitioner. A notice of Federal tax lien (NFTL) dated June 25, 2012, was filed against petitioner on July 2, 2012. A Notice of Federal Tax Lien Filing and Your Right to a Hearing

---

[19] Both Mr. Stamps and Mr. Chislett successfully administratively contested the assessments. Mr. Stamps filed a request for abatement which was granted. Mr. Chislett was granted relief by the IRS Office of Appeals (Appeals).

[20] There is no evidence in the record that petitioner refused delivery of the letter.

**[*16]** Under IRC 6320 was issued to petitioner on July 5, 2012. Petitioner timely filed a collection due process (CDP) appeal on July 25, 2012, and challenged the underlying liability. The Appeals settlement officer issued the notice of determination sustaining the NFTL filing, and petitioner timely filed a petition with this Court.

OPINION

I.    Jurisdiction and Standard of Review

We first address our jurisdiction over this case and the applicable standard of review.

Section 6321 imposes a lien in favor of the United States on all property and rights to property of a taxpayer liable for taxes when a demand for payment of the taxes has been made and the taxpayer fails to pay those taxes. Section 6320(a) requires the Commissioner to provide to the taxpayer a notice of NFTL filing within five business days after a NFTL is filed. A taxpayer receiving a notice may request administrative review of the matter (in the form of a hearing) within a 30-day period. Sec. 6320. At the hearing the taxpayer may raise any relevant issue, including spousal defenses, challenges to the appropriateness of the collection actions, and offers of collection alternatives. Secs. 6320(c), 6330(c)(2)(A). In addition, the taxpayer may challenge the existence or amount of the underlying tax

[*17] liability, but only if the taxpayer did not receive a notice of deficiency or otherwise have an opportunity to dispute the liability. Secs. 6320(c), 6330(c)(2)(B).

Section 6330(d)(1), by cross-reference from section 6320(c), grants this Court jurisdiction to review the Commissioner's determination that the proposed collection action was proper. In reviewing the Commissioner's decision to sustain collection actions, where the validity of the underlying tax liability is properly at issue the Court reviews the Commissioner's determination of the underlying tax liability de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). The Court reviews any other administrative determination regarding proposed collection actions for abuse of discretion. Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. at 182.

The liabilities in this case involve TFRPs. The Commissioner is required to provide the taxpayer with notice of TFRPs before assessment. Sec. 6672(b)(1). A Letter 1153 provides a taxpayer with notice and the means of protesting a proposed TFRP assessment administratively with the Commissioner. Mason v. Commissioner, 132 T.C. 301, 317 (2009). When a Letter 1153 is mailed, the Commissioner must follow the same mailing procedures that are provided for

[*18] notices of deficiency in section 6212(b). Sec. 6672(b)(1). This Court has held that the same evidence that establishes that the Commissioner mailed a notice of deficiency to a taxpayer's last known address should be sufficient to establish that the Commissioner properly sent a Letter 1153. Mason v. Commissioner, 132 T.C. at 318 (citing Hickey v. Commissioner, T.C. Memo. 2009-2).

Respondent's issuance of the Letter 1153 by certified mail, which was sent to petitioner at her last known address, satisfies the notice requirement of section 6672(b)(1). See id. Thus, the TFRP assessments made against petitioner are valid. However, a Letter 1153 that was not received, but was not refused, by a taxpayer does not constitute an opportunity to dispute the taxpayer's liability. See id. The parties agree that petitioner could challenge the underlying liabilities during her CDP hearing because she did not receive a Letter 1153. Furthermore, petitioner did in fact challenge the underlying liabilities during her CDP hearing, and the settlement officer determined that she was liable for them. Because petitioner properly raised the issue of the liabilities during her CDP hearing, we review respondent's determination of the underlying tax liabilities de novo.

II. Trust Fund Recovery Penalties

We next address whether petitioner is liable for the TFRPs assessed against her.

**[\*19]** Employers have a duty to withhold income and employment taxes from their employees' wages.  Secs. 3102(a), 3402(a).  These withheld funds are often referred to as "trust fund taxes" because section 7501(a) characterizes such withholdings as "a special fund [held] in trust for the United States."  Mason v. Commissioner, 132 T.C. at 321.  Employees generally are allowed a credit against their tax liability for the amount of taxes withheld from their wages, regardless of whether the employer actually remits the funds to the Government.  Sec. 31(a); sec. 1.31-1(a), Income Tax Regs.  Therefore, when net wages are paid to an employee and the employer does not pay over the withheld funds, the IRS has no recourse against the employees for their payments and may collect only from the employer.  Mazo v. United States, 591 F.2d 1151,1153 (5th Cir. 1979).[21]

Section 6672 provides a collection tool allowing the Commissioner to impose penalties on certain persons who fail to withhold and pay over trust fund taxes.  See Newsome v. United States, 431 F.2d 742, 745 (5th Cir. 1970).  The penalty under section 6672 is equal to the total amount of the tax that was

---

[21]  In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the Court of Appeals for the Eleventh Circuit adopted as binding precedent the decisions of the former Court of Appeals for the Fifth Circuit handed down before October 1, 1981.  An appeal of this case would lie in the Eleventh Circuit.  See Golsen v. Commissioner, 54 T.C. 742 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

**[\*20]** withheld but not paid over and is imposed on any "person" required to collect, truthfully account for, or pay over any tax withheld who willfully fails to do so.  The term "person" is often taken to mean a "responsible person" and includes an officer or employee of a corporation who, as such, is under a duty to collect, account for, or pay over the withheld tax.  Sec. 6671(b); Mazo, 591 F.2d at 1153; Mason v. Commissioner, 132 T.C. at 321.  Therefore, liability for a TFRP is imposed only on (1) a responsible person who (2) willfully fails to collect, account for, or pay over the withheld tax.  Mazo, 591 F.2d at 1153.

Before we address each of these two elements in turn,[22] we will comment on the credibility of the parties' witnesses.  "As a trier of fact, it is our duty to listen to the testimony, observe the demeanor of the witnesses, weigh the evidence, and determine what we believe."  Kropp v. Commissioner, T.C. Memo. 2000-148, slip op. at 8.  In Diaz v. Commissioner, 58 T.C. 560, 564 (1972), we observed that the process of distilling truth from the testimony of witnesses, whose demeanor we observe and whose credibility we evaluate, is the daily grist of judicial life.  We are not required to accept testimony if it is improbable, unreasonable, or

---

[22] The parties disagree on who has the burden of proof as to whether petitioner was a responsible person who willfully failed to collect, account for, or pay over the withheld taxes.  Because we decide the factual issues in the instant case on the preponderance of the evidence, the allocation of the burden of proof is immaterial.

**[\*21]** questionable. MacGuire v. Commissioner, 450 F.2d 1239, 1244-1245 (5th Cir. 1971), aff'g T.C. Memo. 1970-89.

These statements regarding our role as a trier of fact are particularly apt here. Over the course of seven days of trial, the parties called nine witnesses to testify and introduced numerous documents. Much of the testimony was conflicting. We find petitioner, Mr. Fitzpatrick, Mr. Martin, Amy Mele, and William Boudreaux to be honest, forthright, and credible. Conversely, unless we otherwise expressly state, we did not find the testimony of Mr. Stamps, Mr. Chislett, or Lavendar Morrison to be credible. Additionally, we have little confidence in any of the documents respondent obtained from Mr. Chislett.

### A.    Responsible Person

Now we will address whether petitioner is a responsible person within the meaning of section 6672.

A responsible person is any person required to collect, account for, or pay over withheld taxes. Mazo, 591 F.2d at 1153. Whether someone is a responsible person is a "matter of status, duty and authority, not knowledge." Id. at 1156. The Court of Appeals for the Eleventh Circuit has noted that indicia of responsibility include "the holding of corporate office, control over financial affairs, the authority to disburse corporate funds, stock ownership, and the ability to hire and

[*22] fire employees." <u>Thibodeau v. United States</u>, 828 F.2d 1499, 1503 (11th Cir. 1987).

Respondent argues that petitioner possessed all the recognized indicia of responsibility and was therefore a responsible person within the meaning of section 6672. Respondent further asserts that petitioner exercised substantial financial control over Dey Corp. and that at all times petitioner was a de facto officer of the corporation because she opened two corporate bank accounts, had signatory authority on both accounts, and signed checks on behalf of the corporation.

Petitioner argues that she lacked decisionmaking authority and did not exercise significant control over corporate affairs. Petitioner further asserts that despite her signatory authority, she was not a responsible person within the meaning of section 6672 because she had a limited role in the business' payroll process and merely signed payroll checks for the convenience of the corporation. Petitioner claims that Mr. Stamps and Mr. Chislett were responsible for running the corporation day to day and that her duties were ministerial.

We agree with petitioner and find that the preponderance of the evidence shows that her role was ministerial and that she lacked decisionmaking authority.

**[\*23]** Accordingly, we hold that petitioner was not a responsible person within the meaning of section 6672.

We previously stated that responsibility is a matter of status, duty, and authority. <u>Mazo</u>, 591 F.2d at 1156. In considering the individual's status, duty, and authority, the test is one of substance. <u>In re DeMarco</u>, 258 B.R. 480, 485 (Bankr. M.D. Fla. 1999) (citing <u>Heimark v. United States</u>, 18 Cl. Ct. 15, 23 (1989)). In other words, the focus of the inquiry does not involve a mechanical application of any particular list of factors. <u>Id.</u> The inquiry must focus on actual authority to control, not on trivial duties. <u>Id.</u>; <u>see also</u> <u>Scott v. United States</u>, 825 F.3d 1275 (11th Cir. 2016) (holding that a reasonable trier of fact could find that a taxpayer is not a responsible person even though the taxpayer was (1) named the corporate secretary; (2) worked several hours per week; and (3) had duties including signing payroll checks prepared by a third party, signing nonpayroll checks for routine expenditures, and signing Forms 941).

Petitioner lacked the authority to control the financial affairs of the business or exercise any significant authority over the disbursement of Dey Corp.'s funds. Notwithstanding petitioner's signatory authority and her spousal relationship to one of the corporation's owners, the substance of petitioner's position was largely ministerial and she lacked actual authority. The credible testimony and the

[*24] documentary evidence introduced at trial demonstrate that Mr. Stamps and Mr. Chislett exercised control over the financial affairs of the corporation and that petitioner served only support functions.[23] We are in fact puzzled that Mr. Stamps, the president of the corporation and a hands-on owner, and Mr. Chislett, the day-to-day manager, successfully evaded in the administrative phase any personal liability for these TFRPs.[24]

Petitioner has a high school education. She has never completed or even enrolled in any college-level courses. While petitioner developed strengths in sales and marketing during the course of operating her rental real estate business, she does not have experience in accounting, finance, tax, or management. Respondent, however, goes to great lengths to characterize petitioner as a savvy

---

[23] The employees referred to petitioner as the "runner", "gopher", "helper", and "support person".

[24] RO Wells determined during this phase that petitioner was a responsible person (1) because of her alleged status as secretary of the corporation, (2) because she signed checks, and (3) because a "review of her financial statements shows equity in assets reflecting collection potential". However, we believe RO Wells did not conduct a thorough investigation. For instance, RO Wells made her determination before she received and reviewed the relevant bank records. She also failed to interview (or summon) Mr. Stamps, the president of the corporation. See Robert E. McKenzie, Representation before the Collection Division of the IRS, sec. 5.66 (2016) ("The IRS normally begins its investigation of the * * * [TFRP] by interviewing corporate officers."). After reviewing the administrative record, we also believe that RO Wells was actively misled by Mr. Chislett regarding petitioner's role at the business.

[*25] business person whose actions and prior work experience made her a de facto director. On the basis of the record, we cannot make such a finding. It is clear from the testimony and other evidence that petitioner was not an officer,[25] director, owner, or employee[26] of the corporation at any time. With the exception of a few weeks during the preopening phase, petitioner had no involvement in the day-to-day affairs of the corporation. In fact, she spent most of her time taking care of her disabled son, Evan. Petitioner's health was also weak. As a result of having to constantly lift Evan, she developed spinal stenosis which required periodic injections and epidurals. Consequently, she usually visited the corporation only once a week, on Tuesdays, for less than an hour each time. The

---

[25] The administrative record includes an email that Mr. Chislett provided to respondent that was purportedly sent from petitioner to Mr. Chislett asking him to join her professional network on LinkedIn. The email misspelled petitioner's name and listed her as the CFO of "The Grape Escape". The record shows that petitioner did not create the LinkedIn account and that someone other than she created it as a prank. The record also shows that petitioner was not the CFO of the Grape, the Grape Escape, or any other business. We believe Mr. Chislett knowingly provided this false and misleading email to Appeals in an effort to mischaracterize petitioner as the person responsible for the business' finances. We also find that even though petitioner is listed as the corporate secretary on the First Guaranty account, she was not in fact the corporate secretary and was merely listed as such to facilitate opening the account.

[26] The corporation never paid petitioner a salary; however it did pay her a small stipend from 2005 to 2008 to reimburse her for out-of-pocket costs. Petitioner was not compensated at all from 2009 to 2011.

[*26] record also shows that there were times that she did not visit the business for periods of several months.

Additionally, petitioner had no authority to hire and fire employees of the corporation. She had no responsibility to oversee or ensure the payment of payroll taxes on its behalf. She was not its bookkeeper or accountant.[27] She did not reconcile the bank statements. Even though she wrote and signed roughly 4% of the nonpayroll checks to pay some of the corporation's recurring operating expenses, such as rent, she was merely doing so at the direction of others and for the convenience of the corporation.

Moreover, even though petitioner signed most of the payroll checks prepared by Paychex, the duty was ministerial and done only for the convenience of the corporation. She had no duty to, and did not, oversee the employees, collect payroll information, compile payroll information, or remit the payroll information to Paychex on behalf of the corporation. Mr. Chislett was responsible for carrying out those duties.

Finally, we note that respondent relies heavily upon testimony from Mr. Stamps, Mr. Chislett, and Ms. Morrison. As stated earlier, we do not find these

---

[27] Dey Corp. outsourced its bookkeeping and accounting functions to independent bookkeepers and a C.P.A.

[*27] witnesses credible. Petitioner's cross-examination of Mr. Stamps and Mr. Chislett revealed that their testimony was unreliable and unbelievable. Much of their testimony was inconsistent during trial and conflicts with other credible evidence in the record.[28] Mr. Stamps evaded many of petitioner's questions during cross-examination by repeatedly responding "I don't remember". Additionally, Mr. Chislett and Ms. Morrison projected a bias towards petitioner that made their testimony unreliable and untrustworthy.[29]

Accordingly, because petitioner did not hold corporate office, did not control financial affairs, had no ownership interest, had no authority to hire and fire employees, and otherwise had little or no decisionmaking power beyond

---

[28] Petitioner had Mr. Chislett served with a subpoena duces tecum requiring him to provide all emails he sent to or received from Mr. Stamps, Mr. Fitzpatrick, and petitioner during the relevant periods. Although Mr. Chislett testified that there were probably thousands of emails, he did not produce any to petitioner. He did, however, produce 20 to 30 emails for respondent shortly before trial which purport to show petitioner having decisionmaking authority. Without having the opportunity to review a larger sampling of emails, we find the emails Mr. Chislett produced misleading and inconsistent with the record. We also recognize that Mr. Chislett has previously produced documents and other information to respondent he knows to be false and misleading. We accordingly assign the emails and his testimony very little weight.

[29] Even though Mr. Chislett and Ms. Morrison were admonished by the Court and counsel for respondent not to discuss their testimony with any of the other witnesses or potential witnesses, Ms. Morrison called Mr. Chislett almost immediately after she completed her testimony. Ms. Morrison was aware that Mr. Chislett was scheduled to testify the following day.

**[\*28]** ministerial duties, we find that petitioner was not a responsible person for purposes of section 6672.

    B.    <u>Willfulness</u>

Having determined that petitioner is not a responsible person within the meaning of section 6672, the Court need not determine whether petitioner willfully failed to collect, account for, or pay over the trust fund taxes at issue. However, for the sake of completeness, we choose to do so. We find that petitioner did not willfully fail to collect, account for, or pay over the trust fund taxes at issue.

The willfulness requirement is satisfied if there is evidence that the responsible person had knowledge of payments to other creditors after he or she was aware of the failure to remit the withheld taxes. <u>Thibodeau</u>, 828 F.2d at 1505 (citing <u>Mazo</u>, 591 F.2d at 1157). The willfulness requirement is also met if the responsible person shows a "reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government". <u>Mazo</u>, 591 F.2d at 1154; <u>see also</u> <u>Thibodeau</u> 828 F.2d at 1505. Willfulness does not require a fraudulent or bad motive on the part of the responsible person. <u>Williams v. United States</u>, 931 F.2d 805, 810 (11th Cir. 1991).

**[\*29]** Respondent argues that petitioner had actual knowledge that payroll taxes were not being paid because she had access to the bank statements and documents included in the weekly Paychex package. Respondent further argues that petitioner acted with reckless disregard because she signed checks while failing to adequately review bank statements which should have given her notice that payroll taxes were unpaid. Respondent's arguments would require us to make factual inferences contrary to credible testimony and other evidence in the record, and we therefore decline to accept them.

As stated earlier, Mr. Chislett was Paychex's main contact and therefore responsible for ensuring Paychex provided adequate services. Petitioner merely delivered the Paychex package and any mail she received at her private mailbox to Mr. Stamps or Mr. Chislett at the business location. Petitioner neither reviewed nor was responsible for reviewing the mail or the contents of the Paychex package. Therefore, petitioner had no knowledge as to whether the IRS was contacting the corporation regarding delinquent payroll taxes or whether the statements in the Paychex package reflected that payroll taxes were unpaid.

With regard to respondent's second argument, petitioner did not have the responsibility to scrutinize the bank statements as closely as respondent suggests. Petitioner did not reconcile the bank statements and had no oversight

**[*30]** responsibility for the financial books and records of the corporation. Petitioner was merely directed to relay electronic bank account balances to Mr. Chislett and Mr. Stamps. Therefore, petitioner did not act with reckless disregard in the course of carrying out her ministerial duties.

Petitioner argues that during all relevant periods she lacked the requisite knowledge that payroll taxes were unpaid and that therefore she does not satisfy the willfulness requirement. We find this argument persuasive.

It was not until Mr. Martin contacted Mr. Fitzpatrick and petitioner, several months after the business had been turned over to the franchisor, that petitioner first learned that the corporation had not been making its payroll tax deposits. Consequently, petitioner could not have willfully preferred another creditor over the United States because she did not have the requisite knowledge that payroll taxes were unpaid. Accordingly, we find that petitioner did not act willfully in failing to collect, account for, or pay over the trust fund taxes at issue.

In reaching our holding, we have considered all arguments made, and to the extent not mentioned, we consider them irrelevant, moot, or without merit.

**[*31]** To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.