T.C. Memo. 2019-79

UNITED STATES TAX COURT

TROY K. DIXON, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 1455-14L.                              Filed June 27, 2019.

Troy K. Dixon, pro se.

Karen Lynne Baker, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, Judge:  This case is before the Court on a petition for review of a

Notice of Determination Concerning Collection Action(s) Under Section 6320

and/or 6330, dated December 27, 2013 (notice of determination).[1]  The notice of

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

**[\*2]** determination sustained two notices of Federal tax lien (NFTL) filings with respect to trust fund recovery penalties (TFRPs) under section 6672 assessed against petitioner for failing to collect and pay over employment taxes owed by Crown Staffing, Inc., for 17 taxable quarters[2] from 2005 through 2012. The notice of determination also sustained a proposed levy to collect TFRPs assessed against petitioner for failing to collect and pay over employment taxes owed by Crown Staffing, Inc., for 15 taxable quarters[3] from 2008 through 2012.

The issues for decision are as follows: (1) whether petitioner is entitled to challenge the underlying liabilities, and if so, whether he is a responsible person who willfully failed to pay over employment taxes under section 6672; and (2) whether the settlement officer in the Internal Revenue Service (IRS) Office of Appeals (Appeals) abused his discretion in sustaining the collection actions.

---

[1](...continued)
Revenue Code in effect at all relevant times.

[2]The NFTL filings included taxable quarters March 31 and June 30, 2005; September 30, 2008; March 31, June 30, September 30, and December 31, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012.

[3]The proposed levy included taxable quarters March 31, June 30, and September 30, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012. The notice of determination sustained the proposed levy on all of the above and also included September 30, 2008, and December 31, 2009.

[*3]                      FINDINGS OF FACT

Some of the facts have been stipulated and are so found.  The stipulation of facts and attached exhibits and the exhibits admitted at trial are incorporated herein by this reference.  Petitioner resided in Texas when he timely filed his petition.  At all relevant times petitioner had the same home address of record.

I.      2001-2006

Petitioner grew up around the staffing solution industry, and his parents, James and Sharon Dixon, owned various staffing agencies[4] over the years.  Petitioner returned to Texas in 1999 after having attended college out of State.  In 2000 his father invited him to work at the family staffing business.

A.      Petitioner's Involvement With Crown Staffing, Inc.

Crown Staffing, Inc. (corporation), was incorporated in the State of Texas on March 8, 2001, as an employment staffing agency.  At the age of 23 petitioner was named the corporation's sole director and president, and he held those positions from the corporation's incorporation through and including 2012.  Businesses for which the corporation provided staffing solutions paid the corporation directly.  The people who were staffed at the businesses were

_____

[4]See Dixon v. Commissioner, 141 T.C. 173 (2013); Dixon v. Commissioner, T.C. Memo. 2013-207.

[*4] classified as the corporation's employees, and the corporation was responsible for paying their wages and for withholding Federal taxes from those wages.

Despite his being established as the sole director and president of the corporation on paper, petitioner initially worked under the control and direction of his parents. Petitioner was directed to work on third-shift labor crews, drive fork lifts, and do other "dirty jobs" while his parents actively managed the corporation. He worked at locations offsite from the corporate office. Initially he had meetings with clients and focused on the "labor side" of the business. Later he became more involved in sales and spent more time in the corporate office.

In 2005 petitioner became the safety coordinator for the corporation and handled some sales. Petitioner continued to work on safety and sales offsite and checked in with the corporate office in the mornings and evenings. When he was at the corporate office, he would often have a stack of documents to sign. He did so without reviewing them. Occasionally petitioner checked the mail and made bank deposits, but primarily he left the mail for his parents to open and review.

Up through 2005 petitioner did not exercise any hiring or firing authority over employees and instead would have made any personnel recommendations to his father. He had access to the corporation's checking accounts but was not

[*5] responsible for them. Most checks were signed by one of his parents. He occasionally signed completed Forms 940, Employer's Annual Federal Unemployment (FUTA) Tax Return, and Forms 941, Employer's Quarterly Federal Tax Return, on behalf of the corporation when his mother asked him to do so, but he did not complete or review them.

B.    2005 Tax Liabilities

The corporation did not pay in full its Form 941 employment taxes for the taxable quarters ending December 31, 2004, and March 31 and June 30, 2005. In August 2005 the IRS received from petitioner's mother a Form 4180, Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Taxes. The form reflected petitioner's name as the person interviewed and included his signature; however, his mother had completed the form and asked him to sign it.

In fall 2005 IRS Revenue Officer Feris (RO Feris) appeared at the corporation unannounced and spoke with petitioner. RO Feris explained to petitioner that the corporation had a "tax issue" and owed taxes. During that meeting petitioner did not see any documentation regarding the corporation's taxes. After the meeting petitioner called his parents to obtain guidance and was told that they, and later the corporation's attorneys, would handle the tax issues.

**[\*6]** On October 18, 2005, respondent sent by certified mail a Letter 1153, Trust Fund Recovery Penalty Letter, and a Form 2751, Proposed Assessment of Trust Fund Recovery Penalty, with respect to the corporation's unpaid employment taxes for taxable quarters ending December 31, 2004, and March 31 and June 30, 2005. The certified mail was returned to the IRS on November 14, 2005, unclaimed. Petitioner testified that he did not recall receiving notice of the certified mailing. On May 15, 2006, respondent assessed TFRPs against petitioner for taxable quarters ending December 31, 2004,[5] and March 31 and June 30, 2005, as follows:

| Taxable quarter | Amount assessed |
| --- | --- |
| Dec. 31, 2004 | $27,058.68 |
| Mar. 31, 2005 | 52,661.67 |
| June 30, 2005 | 159,308.51 |

## II. 2007-2013

### A. Petitioner's Involvement With the Corporation

In 2007 and 2008 new corporate bank accounts were opened at Woodforest National Bank. Petitioner had signatory authority over the following accounts:

---

[5]The sec. 6672 civil penalty liability for December 31, 2004, has been paid in full, was not included in the notice of determination, and will not be discussed further.

[*7] a business checking general fund account, a business checking labor payroll account, and a business checking "Special Fund in Trust for U.S. under Sec. 7512, IRC" (trust fund account). Petitioner was named trustee of and had sole signatory authority over the trust fund account. Petitioner believed that the trust fund account would help ensure that the corporation paid its tax liabilities.

In 2008 and 2009 petitioner continued to work in sales and customer service operations for the corporation. By 2009 petitioner began taking over internal operations for the company. He worked on matters related to the corporation's insurance and worker's compensation. From 2008 through and including 2012 he was being groomed to take over the corporation in preparation for his parents' retirement. During that period petitioner had the authority to hire and fire employees. He signed leases on behalf of the corporation. He also transferred funds from the corporation's general fund to its labor payroll account. Petitioner continued to sign any documents his parents requested that he sign, including the corporation's tax returns. Petitioner had a corporate credit card on which he was authorized to, and did, make purchases.

B.     2008-2012 Tax Liabilities

In 2008 the corporation, although paying Form 941 deposits in the hundreds of thousands of dollars, underpaid its tax deposits, and its Forms 941 consistently

[*8] reflected balances due. By fall 2009 the corporation's Form 941 deposits were far less than the balance due, and the corporation oftentimes owed several hundred thousand dollars of unpaid tax on each quarter's return. The corporation filed Form 941 and paid a deposit each quarter, but the large delinquencies continued to accrue through September 30, 2012.

For each taxable quarter from 2008 through 2012 the corporation's general fund account held funds sufficient to pay the corporation's delinquent Form 941 employment taxes. During that period petitioner wrote checks out of the general fund for periodic payments to a professional sports team and a country club totaling $3,017.62 and payments to himself totaling $6,491.20. In contrast, petitioner wrote checks out of the general fund to the IRS totaling only $7,550. Additionally, the funds in the labor payroll account for the corporation were sufficient to have fully paid the balances reflected on the Forms 941 for the taxable quarters ending March 31 and June 30, 2009, and December 31, 2011. Between January 2009 and September 30, 2012, the trust fund account also had a total of $218,520 transferred out of it that was not used to pay the corporation's employment tax liabilities.

[*9]   On October 9, 2012, James Dixon pleaded guilty to tax evasion.[6]  Sharon

Dixon was later convicted for other Federal tax crimes.  See Dixon v.

Commissioner, 141 T.C. 173, 197 (2013) (Goeke, J., concurring).  By 2013

petitioner had fully taken over managing the day-to-day operations of the

corporation because his parents had both been convicted and were set to be

incarcerated.  In 2013 petitioner closed the business.

On January 18, 2013, petitioner was interviewed by IRS Revenue Officer

Boozer (RO Boozer), as reflected on a Form 4180.  The record contains Form

4183, Recommendation re:  Trust Fund Recovery Penalty Assessment, showing

that the initial determination of the TFRPs with respect to the taxable quarters in

issue from 2008 through 2012 was approved in writing on March 7, 2013, by

Group Manager Cynthia L. Brunson, whose electronic signature is on the form.

On March 12, 2013, respondent sent petitioner Letter 3164-A, indicating

that petitioner might have some responsibility regarding the unpaid taxes of the

corporation.  On the same date, by certified mail, respondent sent petitioner a

_____

[6]The Court takes judicial notice of the factual basis for James Dixon's guilty plea.  See Fed. R. Evid. 201; Estate of Reis v. Commissioner, 87 T.C. 1016, 1026-1028 (1986).  "James Dixon was a person who had the duty to collect, to truthfully account for, and to pay over to the IRS the employment taxes of a company named Crown Staffing, Inc., for all employment tax quarters of the years 2003 through the present."  United States v. Dixon, No. 4:12CR00521-0018 (S.D. Tex. Apr. 1, 2013).

**[*10]** Letter 1153 and a Form 2751 for the corporation's unpaid employment taxes for the taxable quarters ending September 30, 2008; March 31, June 30, September 30, and December 31, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012. Petitioner testified that he did not recall receiving the March 12, 2013, mailing.

The U.S. Postal Service (USPS) returned the certified mail to respondent on April 26, 2013, with the notation "Return to Sender Refused Unable to Forward" dated April 25, 2013. On May 17, 2013, respondent assessed TFRPs against petitioner for all of the taxable quarters reflected in the Letter 1153 for the following amounts:

[*11]

| Taxable quarter | Amount assessed |
| --- | --- |
| Sept. 30, 2008 | $99,027.75 |
| Mar. 31, 2009 | 38,240.85 |
| June 30, 2009 | 70,643.89 |
| Sept. 30, 2009 | 182,109.07 |
| Dec. 31, 2009 | 182,386.17 |
| Mar. 31, 2010 | 129,236.67 |
| June 30, 2010 | 198,245.08 |
| Dec. 31, 2010 | 234,915.43 |
| Mar. 31, 2011 | 202,700.01 |
| June 30, 2011 | 131,435.67 |
| Sept. 30, 2011 | 175,968.23 |
| Dec. 31, 2011 | 110,284.56 |
| Mar. 31, 2012 | 173,469.23 |
| June 30, 2012 | 173,449.35 |
| Sept. 30, 2012 | 196,127.89 |

III. Collection Due Process

On January 29, 2013, respondent issued petitioner a Letter 3172, Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320, for the TFRPs with respect to the taxable quarters ending March 31 and June 30, 2005. On June 13, 2013, respondent issued petitioner another Letter 3172 for TFRPs with respect to the taxable quarters ending September 30, 2008; March 31, June

[*12] 30, September 30, and December 31, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012.

On July 1, 2013, respondent issued petitioner a Letter 1058, Final Notice, Notice of Intent to Levy and Notice of Your Right to a Hearing under IRC 6330, for TFRPs for taxable quarters ending March 31, June 30, and September 30, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012 (levy notice). The levy notice did not include the taxable quarters ending September 30, 2008, and December 31, 2009.

Petitioner timely filed three Forms 12153, Request for a Collection Due Process or Equivalent Hearing (CDP hearing requests), in response to the two NFTL filings and the levy notice. The CDP hearing requests sought relief from the liens and proposed levy and acceptance of an offer-in-compromise or an installment agreement. Petitioner's CDP hearing requests stated that he never received notice of the proposed TFRPs as required by section 6672 and consequently never had an opportunity to contest the assessments. Petitioner argues he was not a responsible person and never had the actual authority or

**[\*13]** ability to pay the taxes because the corporation and its taxes were controlled by his parents.

Petitioner's CDP hearing requests were assigned to Settlement Officer Green (SO Green). SO Green confirmed that the Letters 1153 were timely mailed to petitioner's last known address, that there were balances due when the NFTL filings and levy notice were issued, and that petitioner had been appropriately notified of the forthcoming lien and levy actions.

SO Green and petitioner's attorney scheduled several phone conferences between April and November 2013. During that period petitioner provided extensive financial information including Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, dated January 23, 2013. Over the same period petitioner's attorney continued to supply supporting financial documents as requested by SO Green. SO Green concluded that the 2005 unclaimed and 2013 refused certified mailings of Letters 1153 addressed to petitioner's last known address satisfied receipt of the Letters 1153 and constituted prior opportunities to dispute the tax liabilities. SO Green did not review the underlying liabilities for any of the taxable quarters in issue.

Instead, SO Green focused on petitioner's request for an offer-in-compromise or an installment agreement. SO Green faxed a letter to petitioner's

[*14] attorney determining that petitioner's monthly income was $14,275 and monthly expenses were $4,527, allowing for monthly payments of $9,748. SO Green also determined that petitioner had equity in assets to pay toward the liabilities. Petitioner had equity in a 2009 Chevrolet Corvette, a vacant lot, and his personal residence.

In a letter dated November 7, 2013, petitioner's attorney argued that petitioner could not make monthly payments of $9,748 without incurring economic hardship and instead offered a monthly payment of $2,000 to pay the section 6672 civil penalty liabilities. SO Green reduced the proposed payments to $8,402 after recalculating certain expenses. Petitioner's attorney informed SO Green in November 2013 that petitioner intended to close the business by the end of 2013 and would be unable to make any proposed payments.

On December 27, 2013, Appeals issued petitioner the notice of determination sustaining: (1) the NFTL filing for TFRPs for taxable quarters ending March 31 and June 30, 2005; (2) the NFTL filing for TFRPs for taxable quarters ending September 30, 2008; March 31, June 30, September 30, and December 31, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012; and (3) the proposed levy to collect TFRPs for tax quarters ending

[*15] September 30, 2008; March 31, June 30, September 30, and December 31, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012.[7] The attachment to the notice of determination noted that the collection actions would be sustained because petitioner was not willing to agree to an installment agreement based on his current ability to pay.

In response to the notice of determination, petitioner timely petitioned this Court. See sec. 6330(d)(1). Petitioner asserted that (1) he was not a person responsible for paying over and did not willfully fail to pay over the corporation's Form 941 employment taxes, (2) his parents controlled the business and his father controlled the employment taxes, (3) neither petitioner nor petitioner's attorney ever received the Letters 1153 and consequently never had an opportunity to contest the liabilities, and (4) respondent wrongfully rejected his proposed partial payment installment agreement.

---

[7]The proposed levy itself did not include taxable quarters ending September 30, 2008, and December 31, 2009.

**[*16]**                                    OPINION

I.      Section 6672 TFRPs

An employer is required to withhold or collect from an employee's wages

the employee's share of Federal taxes[8] and then must pay over the withheld

amounts to the Federal Government. Jarrett v. Commissioner, T.C. Memo. 2018-

73, at *31. Such withheld amounts are known as "trust fund taxes", id. (citing

Pollock v. Commissioner, 132 T.C. 21, 25 n.10 (2009)), because they are "held to

be a special fund in trust for the United States", sec. 7501(a).

Section 6672(a) imposes the TFRP on "[a]ny person required to collect,

truthfully account for, and pay over any tax imposed by this title who willfully

fails to collect such tax, or truthfully account for and pay over such tax, or

willfully attempts in any manner to evade or defeat any such tax or the payment

thereof ". The term "person" includes an officer or employee of a corporation who

is under a duty to collect, account for, and pay over the tax. Sec. 6671(b). Such

persons are referred to as "responsible persons",[9] and the term may be applied

---

[8]These include the employee's share of (1) Social Security tax, see secs.
3101(a), 3102(a); (2) Medicare tax, see secs. 3101(b), 3102(a); and (3) Federal
income tax, see secs. 3402(a)(1), 3403.

[9]The IRS collects the trust fund liability only once. Consequently, the IRS
cross-references payments against the trust fund liability of the employer and
(continued...)

[*17] broadly.  Mason v. Commissioner, 132 T.C. 301, 321 (2009) (citing Logal v. United States, 195 F.3d 229, 232 (5th Cir. 1999), and Barnett v. IRS, 988 F.2d 1449, 1454 (5th Cir. 1993)).  The TFRP shall be paid upon notice and demand by the Commissioner of Internal Revenue and shall be assessed and collected in the same manner as taxes.  Sec. 6671(a).

Petitioner contends that he is not liable for TFRPs because he was not a responsible person who willfully failed to pay over the withheld taxes for any of the taxable quarters in issue.  Before addressing petitioner's contention, the Court must first decide whether petitioner is entitled to challenge the underlying liabilities.

## II.    Sections 6330 and 6331

Before imposing a TFRP under section 6672, the IRS must properly notify the responsible person and properly assess the penalty against that person.  The IRS must notify the responsible person in writing by mail to the person's last known address that the person will be subject to an assessment of the TFRP.  Secs.

---

[9](...continued)
payments against the TFRPs of responsible persons.  See Weber v. Commissioner, 138 T.C. 348, 358 (2012).  In addition, for circumstances in which there is more than one responsible person, a taxpayer who paid the TFRP may bring a separate suit against the other responsible person(s) claiming a right of contribution.  Sec. 6672(d); see Weber v. Commissioner, 138 T.C. at 358 n.8.

[*18] 6672(b)(1), 6212(b). If the responsible person fails to pay the TFRP after demand, the amount becomes a lien in favor of the United States upon that person's property and rights to property. Sec. 6321. The IRS may then file an NFTL to protect the validity and priority of the lien against certain third parties. Sec. 6323. Once the IRS files an NFTL, it must notify the person of the filing and of the person's right to a CDP hearing to appeal the NFTL filing. Sec. 6320(a) and (b).

Section 6331(a) authorizes the IRS to levy against property and property rights where a taxpayer who is liable for taxes fails to pay those taxes within 10 days after notice and demand for payment. Section 6331(d) requires the Secretary to send the taxpayer written notice of the Secretary's intent to levy, and section 6330(a) requires the Secretary to send the taxpayer written notice of his right to a CDP hearing at least 30 days before any levy. Murphy v. Commissioner, 125 T.C. 301, 307 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006).

If a taxpayer timely requests a CDP hearing, Appeals must conduct the hearing and determine whether to sustain the proposed collection action. In making that determination, section 6330(c)(3) requires Appeals to consider: (1) whether the requirements of any applicable law or administrative procedures have been met, (2) any issues appropriately raised by the taxpayer, and (3) whether

**[*19]** the proposed levy balances the need for the efficient collection of taxes and the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary. At the hearing a taxpayer may raise any relevant issue, including appropriate defenses, challenges to the appropriateness of the collection action, and collection alternatives such as an installment agreement or an offer-in-compromise. Sec. 6330(c)(2)(A). Once Appeals makes a determination, the taxpayer may appeal the determination to the Tax Court. Sec. 6330(d)(1).

III.   Standard of Review

In general a taxpayer must raise an issue at a CDP hearing to preserve it for this Court's review. Perkins v. Commissioner, 129 T.C. 58, 63 (2007); Magana v. Commissioner, 118 T.C. 488, 493 (2002); sec. 301.6330-1(f)(2), Q&A-F3, Proced. & Admin. Regs. Petitioner challenged the underlying liabilities during the CDP hearing by asserting that he was not a responsible person for purposes of section 6672. Thus, the issue of petitioner's liability is properly before this Court unless he was otherwise barred from challenging it at the CDP hearing.

A taxpayer may contest the existence or amount of the underlying tax liability only if the taxpayer did not receive a statutory notice of deficiency or otherwise have an opportunity to dispute the liability. Sec. 6330(c)(2)(B); see also Sego v. Commissioner, 114 T.C. 604, 609 (2000). A taxpayer has the opportunity

**[*20]** to dispute his liability for a TFRP when he receives a Letter 1153. Mason v. Commissioner, 132 T.C. at 317-318. A Letter 1153 that was not received but was not deliberately refused by a taxpayer does not constitute an opportunity to dispute the taxpayer's liability. Id. at 318.

In reviewing the determination, the Court has held that where the validity of the underlying tax liability is properly at issue, the Court will review the matter de novo. Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). Where the validity of the underlying tax liability is not properly at issue, the Court will review the Appeals officer's administrative determination for abuse of discretion. Sego v. Commissioner, 114 T.C. at 610. An abuse of discretion is any action that is arbitrary, capricious, or without sound basis in law or fact. Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

IV.    2005 TFRPs

On October 18, 2005, the IRS issued petitioner a Letter 1153 to inform him of his potential liability for a TFRP as a responsible person and his opportunity to protest the action. The IRS mailed Letter 1153 by certified mail to petitioner's last known address, and it was postmarked on October 18, 2005. On November 14, 2005, the certified mail envelope was returned to the IRS unopened. The envelope did not bear any USPS designations of being refused or rejected, but merely

[*21] unclaimed.  Petitioner did not actually receive the October 18, 2005, Letter 1153, and he did not deliberately refuse it.  For those taxable quarters included in the October 2005 Letter 1153, petitioner had not had a prior opportunity to dispute the liabilities and was therefore not barred from challenging them at the CDP hearing.  Accordingly, the Court will review petitioner's liability for the 2005 TFRPs de novo.

Petitioner's liability for the 2005 TFRPs rests on his being a responsible person with respect to the taxable quarters in issue.[10]  Responsibility is based on an individual's "duty and authority to withhold and pay taxes."  Barnett, 988 F.2d at 1454.  It "does not require actual knowledge that one has that duty and authority." Id.  Factors indicative of such authority include whether the individual:  "(i) is an officer or member of the board of directors; (ii) owns a substantial amount of stock in the company; (iii) manages the day-to-day operations of the business; (iv) has the authority to hire or fire employees; (v) makes decisions as to the disbursements of funds and payment of creditors; and (vi) possesses the authority to sign company checks."  Id. at 1455.

At the beginning of 2005 petitioner was unaware that the corporation had failed to pay its Form 941 taxes for the taxable quarters ending March 31 and June

---

[10]The Court reiterates that there may be more than one responsible person.

**[\*22]** 30, 2005. Petitioner worked under the control and direction of his parents. He was not involved in the day-to-day management of the company. He worked primarily offsite and signed papers when asked to do so. He had recently started his role as safety coordinator after spending some time working on labor crews. Petitioner did not exercise any hiring or firing authority over employees and instead left personnel decisions to his father. Petitioner became aware of the corporation's failure to pay its Form 941 taxes in full only after RO Feris so informed him in fall 2005. Even then, petitioner contacted his parents for guidance and was told that they and the corporation's attorneys would handle any tax matters.

Petitioner did not take a more active role in the corporation until 2007. From 2007 through 2012 petitioner acted upon his authority as the president and sole director of the corporation. He was being groomed to take over the business and participated more actively in the management of the corporation. Petitioner had signatory authority over the corporation's bank accounts. In particular he had sole signatory authority over the corporation's trust fund account, which was opened to ensure the corporation paid its tax liabilities. Petitioner was more involved in the day-to-day operations of the corporation. He wrote checks from

**[\*23]** the corporate accounts and chose to make payments to a professional sports team, a country club, and himself.

The stark contrast between petitioner's duties in 2005 and his role starting in 2007 show that his role in the corporation in 2005 was nominal at most. Petitioner's duties and authority did not make him a responsible person in 2005. Accordingly, the Court does not sustain Appeals' determination relating to the NFTL filing for the TFRPs for the taxable quarters ending March 31 and June 30, 2005.

## V.    2008-2012 TFRPs

A second Letter 1153 for taxable quarters ending December 2008 through September 2012, was mailed by certified mail to petitioner's last known address on March 12, 2013. The certified mail contained a Letter 1153 and a Form 2751 for the corporation's unpaid Form 941 taxes. On April 26, 2013, the certified mail was returned to the IRS with the USPS notation "Return to Sender Refused Unable to Forward" on the face of the envelope. Petitioner's testimony that he did not receive the March 12, 2013, Letter 1153 is not credible. At that point petitioner was aware of the corporation's delinquent tax liabilities and had been interviewed by RO Boozer about the outstanding tax liabilities less than two months before the letter was mailed. With respect to the March 12, 2013, Letter 1153, petitioner

[*24] could not have reasonably expected that his parents would resolve the corporation's tax issues because they were about to be incarcerated. The Court concludes that petitioner deliberately refused the March 12, 2013, Letter 1153. Even though petitioner did not actually receive Letter 1153, because he deliberately refused it, the Letter 1153 is considered as having provided a prior opportunity to dispute the liabilities. See Onyango v. Commissioner, 142 T.C. 425, 431 (2014), aff'd, 638 F. App'x 5 (D.C. Cir. 2016); Mason v. Commissioner, 132 T.C. at 317-318; Giaquinto v. Commissioner, T.C. Memo. 2013-150. Thus, for the taxable quarters included in the March 2013 Letter 1153, petitioner did have a prior opportunity to dispute the liabilities. Therefore, petitioner's liability with respect to the 2008 through 2012 TFRPs is not properly before the Court, and the Court will review Appeals' administrative determination with respect to the collection action for an abuse of discretion.

In determining whether SO Green abused his discretion the Court must consider whether he: (1) properly obtained verification that the requirements of applicable law and administrative procedure had been met, (2) considered any relevant issues petitioner raised, and (3) considered whether the proposed collection action was no more intrusive than necessary. See sec. 6330(c)(3).

[*25] SO Green sustained the IRS' levy notice with respect to the taxable quarters ending September 30, 2008, and December 31, 2009, but neither quarter was included in the levy notice. Section 6330 requires that a levy notice include the amount of unpaid tax. By failing to verify that the IRS had complied with section 6330, SO Green abused his discretion in sustaining the levy action with respect to the taxable quarters ending September 30, 2008, and December 31, 2009. Therefore, the Court does not sustain Appeals' determination with respect to the levy for the taxable quarters ending September 30, 2008, and December 31, 2009.

With respect to the remaining taxable quarters from 2008 through 2012, however, SO Green satisfied his obligation to verify that the requirements of applicable law and administrative procedure had been met.[11] He confirmed that petitioner received timely and proper notice of the proposed assessments and the forthcoming collection actions.

The Commissioner is authorized to enter into written agreements allowing taxpayers to pay any tax in installment payments if he deems that the agreement will "facilitate full or partial collection of such liability." Sec. 6159(a). The

---

[11]Petitioner has not argued that SO Green failed to obtain verification of compliance with the supervisory approval requirement under sec. 6751(b). In any event the Court need not address the applicability of sec. 6751(b) to TFRPs because Form 4183 in the administrative record supports SO Green's verification. See Blackburn v. Commissioner, 150 T.C. 218, 223 (2018).

[*26] decision to accept or reject installment agreements lies within the discretion of the Commissioner. Sec. 301.6159-1(a), (c)(1)(i), Proced. & Admin. Regs. The Court does not normally make an independent determination of what would be an acceptable alternative. Murphy v. Commissioner, 125 T.C. at 320. If Appeals follows all statutory and administrative guidelines and provides a reasoned and balanced decision, the Court will not reweigh the equities. Thompson v. Commissioner, 140 T.C. 173, 179 (2013).

Petitioner argues that SO Green abused his discretion by not considering his collection alternative and by offering unreasonable installment options. SO Green offered a partial pay installment agreement based on the financial information petitioner provided of his current income, assets, and expenses. Upon request and after recalculating certain expenses for petitioner, SO Green offered a partial pay installment agreement with lower monthly payments. Petitioner rejected the proposed installment agreement, stating that he would be unable to make any monthly payments once the business was closed. SO Green did not abuse his discretion when he relied on petitioner's current income and expenses to determine a collection alternative.

[*27] VI.    Conclusion

In view of the foregoing, the Court sustains the notice of determination for the NFTL filing for taxable quarters ending September 30, 2008; March 31, June 30, September 30, and December 31, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012.  The Court also sustains the notice of determination for the levy notice for the taxable quarters ending March 31, June 30, and September 30, 2009; March 31, June 30, and December 31, 2010; March 31, June 30, September 30, and December 31, 2011; and March 31, June 30, and September 30, 2012.

The Court concludes that petitioner was not a responsible person for the taxable quarters ending March 31 and June 30, 2005, and does not sustain the notice of determination for the NFTL filing for those taxable quarters.  The Court also does not sustain the notice of determination for the proposed levy for taxable quarters ending September 30, 2008, and December 31, 2009, because those quarters were not included in the levy notice.

The Court has considered all arguments by the parties and, to the extent not specifically mentioned above, concludes that they are moot, irrelevant, or without merit.

**[*28]** To reflect the foregoing,

An appropriate decision will be entered.